UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AARON MCCOY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GAMESA TECHNOLOGY CORPORATION, INC., | ) |
| GAMESA WIND US, LLC, IBERDROLA | ) |
| RENEWABLES, INC., STREATOR-CAYUGA | ) |
| RIDGE WIND POWER, LLC, | ) |
| | ) |
| Defendants. | ) |
| _____ | )   11 C 592 |
| | ) |
| IBERDROLA RENEWABLES, INC., and | ) |
| GAMESA TECHNOLOGY CORPORATION, INC., | ) |
| | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| OUTLAND RENEWABLE ENERGY, LLC, | ) |
| OUTLAND RENEWABLE ENERGY FIELD | ) |
| SERVICES, LLC and OUTLAND ENERGY | ) |
| SERVICES, LLC, | ) |
| | ) |
| Third-Party Defendants. | ) |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on Counter-Defendant Iberdrola Renewables,

Inc.'s ("Iberdrola") motion to dismiss Counter-Plaintiff Outland Renewable Energy,

LLC, Outland Renewable Energy Field Services, LLC, and Outland Energy Services, LLC's (collectively, "Outland") counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, Iberdrola's motion is granted.

## BACKGROUND[1]

This lawsuit arises out of personal injuries that Aaron McCoy ("McCoy"), an Outland employee, suffered while performing maintenance services on a wind turbine manufactured by Gamesa Wind U.S., LLC ("Gamesa").  The wind turbine was located at the Cayuga Ridge wind farm ("Cayuga Ridge"), a wind farm operated by Iberdrola.  Though the case was born as a personal injury suit, it has expanded into a web of counterclaims, crossclaims, and counter-crossclaims that are, at best, only tangentially related to McCoy's injuries.  Outland's present counterclaim, for example, includes allegations of antitrust violations and tortious interference with business relationships that have no bearing on McCoy's negligence suit.

**The Gamesa-Outland Relationship**

Gamesa manufactures and sells wind turbines to various wind farms.  At its peak, Gamesa controlled more than 10% of the U.S. market for wind turbine sales.  As part of the sale of its turbines, Gamesa requires that purchasers contract with Gamesa for operation, maintenance, and repair services ("O&M Services") for the wind turbines for

---

[1]  For the purposes of a motion to dismiss, the Court accepts all well-pleaded allegations in the complaint as true. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009).

a specified period of time. As Gamesa does not have an internal O&M Services division, it subcontracts its O&M Services to other companies such as Outland.

Between August 2006 and October 2008, Gamesa subcontracted its O&M services to Outland through purchase orders, which would encompass work for a specific task or set of tasks. By 2010, Outland generated approximately $6.1 million in revenue through Gamesa purchase orders.

To ensure longer-term commitments, Gamesa and Outland entered into a Framework Services Agreement (the "FSA") on October 3, 2008. Under the FSA, Gamesa would subcontract its O&M Services to Outland at certain Iberdrola-operated wind farms for a longer period of time. On November 19, 2009 Outland and Gamesa entered into a new agreement, the Maintenance Services Agreement (the "MSA"). Purchase orders executed under the MSA placed additional Iberdrola wind farms, including Cayuga Ridge, under a long-term agreement. The MSA further required Outland to train its employees on health and safety standards and to comply with any of Iberdrola's site-specific rules and safety procedures.

**The Gamesa-Iberdrola Relationship**

Prior to this action, Iberdrola had been purchasing wind turbines from Gamesa for use on its wind farms. In 2009, Gamesa and Iberdrola entered into a strategic agreement to jointly develop and operate wind farms. Outland alleges that as of 2009

Iberdrola owned approximately 25% of Gamesa and currently owns approximately 14% of Gamesa.

### The Safety Protocols and McCoy's Injury

Outland technicians use a "lock-out, tag-out" ("LOTO") safety procedure when dealing with potentially hazardous electrical energy. Under the LOTO procedure, the turbine is powered down and a technician locks the controls such that the turbine cannot be powered up while the lock is in place. Each individual technician maintains his own lock and controls the key to that lock, and no other individual can remove the lock and power up the turbine. The technician then applies a tag to the lock upon which he describes the nature of the maintenance he is performing to inform other technicians of the need for the lock. The tag states that it is only to be removed by the person who affixed it to the lock. Having applied the lock and tag, the technician may climb to the top of the turbine tower to safely perform maintenance services. The LOTO procedure complies with industry standards and federal regulations.

In September 2010, Iberdrola and Gamesa modified the standard LOTO procedure such that a technician would not retain his key after locking the power controls. Rather, the technician would leave the key near the lock while he scaled the tower to service the turbine. Upon completing his work, the technician would retreat to a "safe zone" away from hazardous electrical equipment and communicate via radio

with an Iberdrola technician, who would unlock the power controls and power up the turbine. Upon ensuring that the turbine was functioning properly, the technician would climb down from the tower. This modified LOTO procedure increased efficiency, as a technician would not need to repeatedly climb up and down the tower and re-energize the turbine to perform multiple maintenance operations. Outland's off-site management was unaware of the use of the modified LOTO procedure.

On October 20, 2010, McCoy and several other Outland technicians were working uptower in different turbines at Cayuga Ridge. The technicians were using the modified LOTO procedure rather than the standard LOTO procedure. When one technician radioed an Iberdrola technician to re-energize a wind turbine, the Iberdrola technician mistakenly powered up the turbine that McCoy was servicing. This resulted in an electrical explosion that caused McCoy's injuries.

As a result of the accident, the United States Occupational Health and Safety Administration ("OSHA") conducted an investigation. On April 8, 2011 OSHA issued six citations to Outland concerning the modified LOTO procedure. Although neither Gamesa nor Iberdrola were cited, Outland alleges that OSHA informally warned Iberdrola that it would seek criminal penalties if another accident occurred at an Iberdrola site.

**Gamesa's Attempted Takeover of Outland**

In the summer of 2010, Gamesa shifted its business model. Rather than continuing to subcontract its O&M Services to other companies, Gamesa decided to develop an internal O&M Services division. However, Gamesa had assured Outland that the companies would not compete. Despite these assurances, Gamesa openly attempted to recruit Outland technicians. These attempts were ultimately unsuccessful, with only a few Outland technicians moving to Gamesa. Finally, in January 2011, the head of service at Gamesa expressed interest in formally acquiring Outland. Outland's President declined Gamesa's offer.

Gamesa then allegedly secretly attempted to put Outland out of business so that it could hire its employees at minimal cost while simultaneously eliminating Outland as a competitor. Throughout this time, Gamesa allegedly misrepresented to Outland that Outland would continue to receive Gamesa's purchase orders.

On February 17, 2011 Outland and Duke Energy, one of Iberdrola's competitors, entered into a letter of intent pursuant to which Duke Energy would purchase a 25% interest in Outland. Gamesa determined that this deal could potentially allow Outland to withstand Gamesa's destablization attempts. On February 26, 2011 Gamesa called Outland and stated that Iberdrola may refuse to allow Outland to perform O&M Services on its wind farms if the deal went through because Iberdrola and Duke Energy

-6-

were competitors. However, on March 27, 2011 Outland contacted Iberdrola directly. Iberdrola informed Outland that it endorsed Outland's prospective agreement with Duke Energy and reassured Outland that the competition between Duke Energy and Iberdrola was not a concern.

As a result of this conversation, Gamesa allegedly escalated its approach. On April 14, 2011 Gamesa called Duke directly and stated that it opposed Duke Energy's agreement with Iberdrola. During this conversation, Gamesa attempted to induce Duke to abstain from purchasing an interest in Outland, but Duke Energy rejected Gamesa's interference. On May 11, 2011 Duke Energy and an unnamed institutional investor entered into an agreement with Outland for the sale of 100% of the interests in Outland.

The very next day, Gamesa sent a letter to Outland declaring Outland in default under the MSA for violation of the health and safety requirements of the agreement and cited to the OSHA violations issued to Outland. Gamesa also stated that Iberdrola demanded that Gamesa remove Outland from all of its wind farms. Shortly thereafter, Gamesa ceased subcontracting any new business to Outland. Within days thereafter, both Duke Energy and the unnamed institutional investor reduced the amount that they were willing to pay for Outland by approximately $15 million dollars. The acquisition ultimately failed.

In various letters between May and July 2011, Gamesa reiterated that Outland was in default under the MSA and the dormant FSA. On August 31, 2011 Gamesa's

attorneys sent letters to Outland in which they disclosed that Gamesa had contacted various third parties in an attempt to interfere with Outland's ability to receive subcontracts with these third parties. Outland alleges that Gamesa acted in concert, combination, or conspiracy with Iberdrola throughout these events.

**Procedural Posture**

On December 7, 2010 McCoy filed a negligence action against Gamesa's parent corporation, Gamesa Technology Corporation, Inc., and Iberdrola in Illinois state court, which was removed to this Court on January 26, 2011.[2] Iberdrola filed a third-party complaint against Outland for contribution, upon which Outland mounted its offensive, which included a twenty-three count counterclaim against Gamesa and a nine count counterclaim against Iberdrola. Iberdrola now moves to dismiss Outland's counterclaim in its entirety.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss is used to test the legal sufficiency of a complaint. To state a claim, the allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While detailed factual allegations are not required, a plaintiff must provide enough factual support to raise his right to relief above a speculative level. *Bell Atl.*

---

[2] On August 30, 2011 McCoy filed an amended complaint naming Gamesa and Streator-Cayuga Ridge Wind Power, LLC as additional defendants.

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice;" rather, a claim must provide sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Twombly,* 550 U.S. at 570).  In ruling on a motion to dismiss, a court accepts all well-pleaded facts and allegations as true and draws all reasonable inferences in the plaintiff's favor. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009).

## DISCUSSION

The nine counts of Outland's counterclaim fall into three broad categories:  (1) claims for tortious interference with business relationships (Counts I-V), (2) antitrust claims (Counts VI, VII, and IX), and (3) a request for injunctive relief (Count VIII).  Although the gravamen of Outland's claims involve Gamesa's behavior, Outland implicates Iberdrola in the majority of its claims by alleging that Gamesa and Iberdrola conspired to engage in the illicit conduct.  Therefore, we first address Outland's conspiracy allegations.

## I.    Conspiracy

Outland's claims against Iberdrola are premised upon two conspiracy theories.  First, Outland alleges that Gamesa and Iberdrola tortiously interfered with Outland's business relationships by conspiring to eliminate Outland as a competitor.  Second, Outland alleges that Gamesa and Iberdrola violated several federal and state antitrust

laws by both conspiring to eliminate Outland as a competitor and by conspiring to engage in an unlawful tying arrangement. We address each of these conspiracy theories in turn.

### A.  Conspiracy to Eliminate Outland

To establish a civil conspiracy under Illinois law, a plaintiff must show that each alleged conspirator "knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). Allegations that the parties entered into an agreement must include sufficient factual support to raise the right to relief above the speculative level. *Twombly,* 550 U.S. at 555.

Outland's counterclaim falls woefully short of implicating Iberdrola in a conspiracy, either directly or circumstantially. Outland premises its conspiracy allegations exclusively on two facts. First, Outland points to the financial ties between Gamesa and Iberdrola as an indication that Iberdrola would benefit if Gamesa's plan was successful. Second, Outland alleges that Iberdrola required or urged Gamesa to remove Outland from its wind farms. However, these allegations, even if true, do not allow for the reasonable inference that there was a broader agreement between Iberdrola and Gamesa to destroy Outland. Outland's counterclaim encompasses allegedly tortious conduct by Gamesa that spans nearly a year, but Outland has not alleged at what point Iberdrola agreed to participate in Gamesa's plan. Rather, Outland conclusorily alleges

that Iberdrola acted "in concert, combination, or conspiracy" with Gamesa, and this naked assertion does not raise the possibility of a conspiracy above the speculative level.[3]

To the contrary, Outland's counterclaim demonstrates that Gamesa acted independently of Iberdrola. A court may dismiss a claim if the complaint includes facts that undermine the claim. *McMillian v. Litscher*, 72 Fed. App'x 438, 441 (7th Cir. 2003); *Junction Solutions, LLC v. MBS Dev., Inc.*, No. 06 C 1632, 2007 WL 4234091, at *5 (N.D. Ill. Nov. 20, 2007) (citing *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). Outland's naked assertion of a conspiracy is belied by the allegations that Gamesa had its own agenda and was acting independently of Iberdrola. For example, Outland's allegation that Iberdrola "required or urged" Gamesa to remove Outland from its wind farms suggests that the companies were not involved in a common scheme. Additionally, when Iberdrola informed Outland that it endorsed the Duke Energy acquisition and that the agreement was "not a concern," Gamesa was forced to "escalate its approach" to destabilize Outland. This suggests that Iberdrola had actually subverted Gamesa's plan.

---

[3] Outland maintains that it need not provide greater factual support for its claims because a motion to dismiss must only be granted "if it is impossible for the plaintiff to prevail under any set of facts that could be proven consistent with the allegations." (Pl.'s Resp. at 2) (quoting *Jackson v. United States Steel Corp*, No. 05-CV-486DRH, 2006 WL 897903 at *2 (S.D. Ill. Apr. 3, 2006)). Outland misstates the prevailing law. As discussed above, the current legal standard for testing the sufficiency of a complaint is set forth in *Twombly* and its progeny and requires that a complaint plead sufficient facts that raise the right to relief above the speculative level. 550 U.S. at 555.

Ultimately, Outland details Gamesa's plan through twenty pages of allegations, after which it conclusorily alleges that Iberdrola acted "in concert, combination, or conspiracy" with Gamesa. This conclusory allegation is insufficient to survive a motion to dismiss. Accordingly, Counts III and IV, which exclusively implicate Iberdrola through allegations of a civil conspiracy to eliminate Outland as a competitor, are dismissed.

### B.    Antitrust Conspiracy

Counts VI, VII, and IX allege antitrust violations arising under two distinct theories. First, Outland alleges that Gamesa and Iberdrola violated the Sherman Act, 15 U.S.C. §§ 1-7, and the Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code § 15.50 (the "Texas Antitrust Act"),[4] by conspiring to eliminate Outland as a competitor in the market for O&M Services on Gamesa wind turbines. As discussed above, however, Outland has failed to sufficiently plead the existence of such a conspiracy. Second, Outland claims that Gamesa and Iberdrola violated the Clayton Act, 15 U.S.C. § 14, the Minnesota Antitrust Act, Minn. Stat. § 325D.52, and the Texas Antitrust Act by conspiring to engage in an illegal tying arrangement of Gamesa O&M

---

[4] Count IX alleges that Iberdrola violated Section 15.50 of the Texas Antitrust Act. Section 15.50 deals with covenants not to compete, and Outland has not pled any such cause of action in its complaint. Presumably, Outland intended to allege a violation of Section 15.05, which prohibits conspiracies in restrain of trade and mirrors the language of the Sherman Act.

Services to Gamesa wind turbines.[5]  A tying arrangement is the practice of selling one product or service on the condition that the buyer also purchases a different product or service.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992).

Outland alleges that Gamesa and Iberdrola conspired to engage in an unlawful tying arrangement by requiring purchasers of Gamesa's wind turbines to contract with Gamesa for O&M Services on those turbines.  To succeed on an antitrust conspiracy claim, a plaintiff must establish that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  However, Outland's allegations of a tying conspiracy are even more attenuated than those of its alleged conspiracy to eliminate Outland as a competitor.  Outland exclusively relies on the financial ties between Gamesa and Iberdrola to support its allegation of a tying conspiracy.  The fact that Iberdrola may profit from Gamesa's alleged tying scheme, without more, is insufficient to plausibly suggest that Iberdrola played any role in the design, development, or implementation of Gamesa's alleged tying scheme.  Therefore, Outland has failed to sufficiently plead a tying conspiracy.

---

[5]  Courts routinely evaluate antitrust claims under the Minnesota Antitrust Act of 1971 and the Texas Antitrust Act by applying federal antitrust law.  Therefore, Outland's state and federal antitrust claims rise and fall together.  *See Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 557 (Minn. Ct. App. 2001); *Marlin v. Robertson*, 307 S.W.3d 418, 422 n.2 (Tex Ct. App. 2009).

As Outland has failed to plead an antitrust conspiracy under either theory, Counts VI, VII, and IX are dismissed. We now turn our attention to Outland's remaining claims for tortious interference with existing and prospective business relationships (Counts I, II, and V) and Outland's request for injunctive relief (Count VIII).

## II.    Tortious Interference Claims

Counts I and II allege that Iberdrola interfered with Outland's existing and prospective business relationship with Gamesa. To state a claim for tortious interference with an existing contractual relationship, a plaintiff must allege: (1) the existence of a valid and enforceable contract, (2) the defendant's awareness of the contract, (3) the defendant's unjustified and intentional inducement of a breach of the contract, (4) a subsequent breach of the contract, and (5) damages. *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (citing *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991)). The elements of a claim for tortious interference with a prospective economic relationship are similar: (1) plaintiff's reasonable expectation of entering into a valid business relationship, (2) defendant's knowledge of this expectation, (3) defendant's intentional interference that prevents plaintiff's reasonable expectation from materializing, and (4) damages. *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 527-28 (7th Cir. 2003) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)).

-14-

The parties dispute whether Outland has sufficiently alleged that Iberdrola unjustifiably and intentionally induced Gamesa to breach the MSA and prevented Outland's prospective relationships from materializing. Under Illinois law, a defendant has induced a breach only if "the contract would otherwise have been performed," i.e., "that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof." *Farley v. Kissell Co.*, 310 N.E.2d 385, 390 (Ill. App. Ct. 1974) (internal quotation omitted); *see Morris v. Northstar Aerospace (Chi.) Inc.*, No. 11 C 210, 2011 WL 6938455, at *4 (N.D. Ill. Dec. 29, 2011) (dismissing a claim of tortious interference with a contract when it was not plausible that the alleged interference caused the breach). Similarly, for claims of tortious interference with a prospective business relationship, "the interference complained of must induce or cause a breach or termination of the relationship or expectancy." *Heying v. Simonaitis*, 466 N.E.2d 1137, 1141 (Ill. App. Ct. 1984).

The only factual support that Outland provides for its allegation that Iberdrola caused Gamesa to breach its existing and prospective agreements with Outland are statements made by Gamesa that Iberdrola did not want Outland personnel on its wind farms. The sole assertion that Iberdrola required or urged Gamesa to remove Outland from Iberdrola sites is directly contradicted by the first 122 allegations of Outland's counterclaim, in which Outland unambiguously alleges that Gamesa intended to breach

the MSA independent of any alleged demands by Iberdrola. For example, Outland alleges that Gamesa "intended to . . . frivolously terminate the MSA" and that Gamesa designed and implemented a plan to "terminate the remaining contractual work represented by the MSA." Outland alleges an intricate scheme by Gamesa to eliminate Outland as a competitor that began nearly one year before Gamesa made any representation that Iberdrola would no longer accept Outland personnel on its wind farms. As Gamesa had been plotting to breach the MSA for a considerable time period, it is not plausible that Iberdrola induced Gamesa to breach the agreement. Outland's allegations that Iberdrola caused Gamesa to breach its agreements, when considered in light of Gamesa's scheme to destroy Outland, do little to plausibly suggest that Iberdrola caused Gamesa to breach the MSA. Therefore, Counts I and II are dismissed.

Count V alleges that Iberdrola intentionally interfered with "Outland's directives, training, and safety protocols by directing Outland's on-site technicians to use a [modified] LOTO procedure," thereby forcing Outland to breach the MSA. Tortious interference with a contractual relationship requires an allegation that a defendant (Iberdrola) induced a third party (Gamesa) to breach its contract with a plaintiff (Outland). *Skopp v. First Fed. Sav. of Wilmette*, 545 N.E.2d 356, 361 (Ill. App. Ct. 1989). Here, Outland alleges that Iberdrola induced Outland, not Gamesa, to breach the MSA. Outland cannot state a claim for tortious interference by alleging that Iberdrola induced Outland to breach its own agreement. Accordingly, Count V is dismissed.

-16-

### III. Injunctive Relief

Count VIII alleges that Outland seeks an injunction to prevent Iberdrola from taking further action to interfere with Outland's ongoing and prospective business relationships and from making false or disparaging statements with respect to Outland. A request for an injunction is a remedy and not a cause of action. As the remainder of Outland's claim has been dismissed for failing to state a claim, Outland is not entitled to this relief, and Count VIII is dismissed.

### IV. Dismissal Without Prejudice

Iberdrola requests that Outland's counterclaim be dismissed with prejudice. Outland has not previously requested leave to amend its counterclaim, and at this stage we cannot definitively conclude that Outland is unable to provide additional factual support of a conspiracy to implicate Iberdrola. Therefore, Outland's counterclaim is dismissed without prejudice. Should Outland request leave to file an amended counterclaim pursuant to Federal Rule of Civil Procedure 15(a), the Court will evaluate Outland's request at that time.

The Court does, however, express serious concern over the tenuous relationship between Outland's counterclaim and McCoy's personal injury suit that spawned the present litigation. Outland contends that Iberdrola and Gamesa used McCoy's accident as a pretext for implementing their scheme to destroy Outland and evade responsibility for McCoy's injuries. The broad scheme alleged by Outland bears no relation to

whether McCoy is entitled to compensation for his injuries, either from Gamesa, Iberdrola, or Outland. Moreover, Outland's counterclaim would unjustifiably prolong the adjudication of McCoy's right to recover for his injuries. We recognize that Outland, as a third-party defendant, is entitled to assert any counterclaims it may have against Iberdrola, the third-party plaintiff. *See* Fed. R. Civ. P. 14(a)(2)(B). However, a court may nevertheless sever any counterclaims that are "discrete and separate" from the original claims such that "one claim is capable of resolution despite the outcome of the other claim." *Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 442 (7th Cir. 2006) (citing *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000)); Fed. R. Civ. P. 21. Should Outland request leave to re-plead its counterclaim rather than file an independent suit against Iberdrola, the Court would consider the possibility of severance at that time.

## CONCLUSION

In light of the foregoing, Iberdrola's motion to dismiss Outland's counterclaim in its entirety is granted.

Charles P. Kocoras
United States District Judge

Dated:   January 26, 2012

-18-