**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AARON MCCOY,<br><br>                Plaintiff<br><br>v.<br><br>GAMESA TECHNOLOGY CORPORATION, INC., and<br>IBERDROLA RENEWABLES, INC.,<br><br>                Defendants. | District Judge<br>The Honorable Charles P. Kocoras<br><br>Magistrate Judge:<br>The Honorable Arlander Keys<br><br>Case No. 11-CV-00592<br><br>JURY DEMAND |
| IBERDROLA RENEWABLES, INC. and<br>GAMESA TECHNOLOGY CORPORATION, INC.,<br><br>                Third-Party Plaintiffs,<br><br>v.<br><br><br>OUTLAND RENEWABLE ENERGY, LLC.<br>OUTLAND ENERGY SERVICES, LLC<br>OUTLAND RENEWABLE ENERGY FIELD SERVICES, LLC,<br><br>                Third-Party Defendants. | |
| IBERDROLA RENEWABLES, INC.<br><br><br>                Third-Party Plaintiffs,<br><br>v.<br><br><br>GAMESA WIND US, LLC<br><br>                Third-Party Defendants. | |
| GAMESA TECHNOLOGY CORPORATION, INC.,<br><br><br>                Third-Party Plaintiffs,<br><br>v.<br><br><br>STREATOR - CAYUGA RIDGE WIND POWER, LLC<br><br>                Third-Party Defendants. | |

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND

A.  The Primary Action.................................................................................... 2
B.  The Framework Services Agreement Terms, the Maintenance Services
    Agreement Terms and the Purchase Order Terms .................................... 3

    1.  Statements of Work Were Executed Under Both The FSA and MSA ................. 4
    2.  Purchase Orders Issued by Gamesa for Transactional Work Less Than
        Two Years Were Subject to Gamesa's Terms and Conditions, Not SOWs,
        the FSA, or the MSA ........................................................................................ 5
    3.  Gamesa Issued an 11-Month Purchase Order for the Work at Big Horn II,
        Not a Statement of Work Under the MSA ........................................................ 7
    4.  The FSA, the MSA and the Big Horn Purchase Order All Expired ..................... 7
    5.  Outland's Work at Big Horn II Was Subject to Its Compliance With
        Safety Laws and Rules ...................................................................................... 8
    6.  Outland's Work at Big Horn II Was Subject to Compliance With
        Gamesa's Confidentiality Provisions................................................................. 9
    7.  Both the FSA and the MSA Have Non-Compete Provisions ............................. 10

C.  Outland's Multiple Material Breaches ......................................................... 11

    1.  Outland Breached the MSA's Safety Provision................................................. 12
    2.  Outland Breached the MSA's Non-Compete and Confidentiality
        Provisions.......................................................................................................... 13

D.  The Big Horn II Work Was Negotiated as nn 11-Month Purchase Order, Nothing
    More .......................................................................................................... 15

III.  ARGUMENT

A.  A Preliminary Injunctions Is an Extraordinary Remedy............................. 16
B.  Outland Cannot Succeed on the Merits ..................................................... 17

    1.  The MSA Does Not Govern Big Horn II; the 11-Month Purchase Order
        Governs. ............................................................................................................ 18
    2.  Even if MSA applies to Big Horn II, Gamesa Had Authority To Terminate
        the MSA ............................................................................................................ 22

C.  Outland Will Not Suffer Irreparable Harm and Has an Adequate Remedy at Law ........ 24
D.  Gamesa Will Suffer Irreparable Harm if It Must Continue To Employ Outland ........... 26
E.  Substantial Security Is Necessary to Protect Gamesa.................................... 27
F.  Disputed Material Facts Require Denial of Injunction and an Evidentiary Hearing ....... 28

IV.  CONCLUSION .................................................................................................. 29

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867 (2d Cir. 1971) .................................................................................................. 29

*Cement Enamel Dev, Inc. v. Cement Enamel of New York, Inc.*, 186 F. Supp. 803 (D.C.N.Y. 1960) .................................................................................. 29

*Coyne-Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385 (7th Cir. 1983) ...................... 28

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) .......................................................... 25

*Falls v. State Farm Ins. Mut. Auto Ins. Co.*, 774 F. Supp.2d 705 (M.D. Pa. 2011)................. 23

*Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957 (N.D. Ill. 2010)........................................................................................ 17

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 588 F. Supp. 2d 919 (S.D. Ind. 2008) ................................................................ 25

*Leland v. Morin*, 104 F. Supp. 401 (D.C.N.Y. 1952) ................................................ 26

*MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742 (7th Cir. 2007) ................. 16, 17

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ............................................................ 16

*Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883 (7th Cir. 2000) ........................ 28

*Nutri-Sys., Inc. v. Hirschinger*, Civ. A No. 83-0562, 1986 WL 10793, at *7 (E.D. Pa. Sept. 30, 1986) .................................................................... 22

*Protect Marriage IL v. Orr*, 458 F. Supp.2d 562 (N.D. Ill. 2006).............................. 17

*Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) ..................... 24, 27

*St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616 (7th Cir. 2007) ........................................................................................ 17, 27

*USA Satellite & Cable, Inc. v. North American Cable Equipment, Inc.*, No. 09 C 2067, 2011 WL 1692391, at *8 (N.D. Ill. May 2, 2011) ........................ 24

*Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598 (7th Cir. 1984).................................. 25

*Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292 (3d Cir. 1940)........................ 29

### STATE CASES

*Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 948 N.E.2d 132 (2011).............. 18

*Larken, Inc. v. Larken Iowa City Ltd. P'ship*, 589 N.W.2d 700 (Iowa 1999)............. 23

*Lesko v. Frankford Hosp.-Bucks County*, 15 A.3d 337 (Pa. 2011 ........................ 18, 19

*LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639 (Pa. 2009) .................... 22

*Parrott Mechanical, Inc. v. Rude*, 118 Wash. App. 859, 78 P.3d 1026 (2004).......... 18

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425 (Pa. 2004)..................... 18, 19

**GAMESA TECHNOLOGY CORPORATION, INC'S AND GAMESA WIND US, LLC'S
OPPOSITION TO OUTLAND'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND FOR PRELIMINARY INJUNCTION**

NOW COME Defendants, Gamesa Technology Corporation, Inc. (hereinafter, "Gamesa Technology") and Gamesa Wind US, LLC (hereinafter, "Gamesa Wind" and, collectively with Gamesa Technology, "Gamesa"), by and through their attorney, Julie Negovan, Esq., of Kutak Rock LLP, and hereby oppose the Motion for Temporary Restraining Order and Preliminary Injunction (hereinafter, the "Motion") (Doc. 201) filed by Outland Renewable Energy, LLC n/k/a Renova Renewable Energy, LLC (hereinafter, "ORE"), Outland Renewable Energy Field Services n/k/a Outland Energy Services, LLC (hereinafter, "OREF") and Outland Energy Services, LLC f/k/a Outland Energy Field Services, LLC (hereinafter, "OES" and, collectively with ORE and OREF, "Outland") (hereinafter, "Opposition").

## I. INTRODUCTION

On May 12, 2011, July 21, 2011, August 31, 2011 and December 7, 2011, Gamesa notified Outland of numerous breaches of the Maintenance Services Agreement[1] (hereinafter, the "MSA") relating to safety, solicitation of Gamesa's customers and employees and improper disclosure of Gamesa's confidential information. Separately, on January 4, 2012, Gamesa notified Outland that the purchase order governing Outland's work at the Big Horn II site in Washington state would expire on January 31, 2012 and no further purchase orders would be issued for that work.

Outland now seeks a Preliminary Injunction to enjoin Gamesa from "terminating Outland's performance of service at Big Horn II before October 23, 2012 . . . ." (Doc. 201, p. 28). Aside from pointing to extrinsic evidence, conjecture and speculation, Outland puts forth

---

[1] A true and correct copy of the MSA was filed at Doc. 53, pages 21 through 56. All references to the MSA are cited as MSA, § __.

no evidence, based on the MSA alone, that the MSA governs Outland's performance of services at Big Horn II.

Significantly, even if this Court determines the MSA's terms govern the parties' duties and responsibilities as to Big Horn II, nothing in the MSA provides for a two-year term of work. Even assuming the MSA governs the work, and assuming there was a two-year term, Gamesa has properly asserted its right to terminate the MSA and the work at Big Horn II.

Outland violated the terms of the MSA in three significant ways: failing to follow requisite safety laws; engaging in negotiations and contracts with Gamesa's customers and disclosing Gamesa's confidential information. Accordingly, Gamesa was within its right to terminate the MSA and Outland's services at Big Horn II.

Finally, in the event this Court determines the MSA applies and has not been terminated, Outland is still not entitled to injunctive relief. Outland failed to put forth any credible or reliable evidence that it will suffer irreparable harm or that it does not have an adequate remedy at law. Conclusory allegations that the company will go out of business are not enough to establish irreparable harm. Accordingly, Outland's Motion should be denied.

## II.     FACTUAL BACKGROUND

### A.     The Primary Action

On December 7, 2010, Plaintiff Aaron McCoy filed a two-count Complaint against Gamesa Technology and Defendant/Third-Party Plaintiffs Iberdrola Renewables, Inc. (hereinafter, "Iberdrola"). Plaintiff alleged that on October 20, 2010, during the course of his employment with ORE and/or OES at the wind farm near Cayuga Ridge South, Livingston County, Illinois (hereinafter, "Cayuga Ridge"), the power source for the wind turbine at issue was turned on or otherwise activated, causing Plaintiff to suffer significant injuries. Plaintiff seeks damages from Gamesa Technology and Iberdrola based upon alleged negligent

and careless acts or omissions. Gamesa Technology denied all of Plaintiff's material allegations and further denied it was liable to Plaintiff or anyone for Plaintiff's alleged injuries. Moreover, Gamesa has sought contribution from Outland for Plaintiff's injuries. In response to Gamesa's claim for contribution, Outland filed a Counterclaim asserting 23[2] counts of various tort, contractual and antitrust claims. (Doc. 112 (hereinafter, "Counterclaim")).

**B.    The Framework Services Agreement Terms, the Maintenance Services Agreement Terms and the Purchase Order Terms**

Gamesa manufactures and sells wind turbines to various asset owners, including Iberdrola.[3]    (Counterclaim, ¶ 5). Owners also contract for Gamesa to provide operation, maintenance and repair services (hereinafter, "O&M Services") for the purchased wind turbines for a specified period of time. (Counterclaim, ¶ 5). Gamesa typically subcontracts the O&M Services to various subcontractors, including Outland. (Counterclaim, ¶ 6).

On October 3, 2008, Gamesa Wind and ORE entered into the Framework Services Agreement (hereinafter, the "FSA")[4] wherein Outland agreed to perform O&M Services at certain wind farms under certain financial and legal terms. (Counterclaim, ¶ 16).

Approximately a year later, on November 19, 2009, Gamesa Wind and ORE entered into another agreement, the MSA, which provided that Outland provide O&M Services for additional wind farms throughout the United States to be determined on a project-by-project basis under certain financial and legal terms. (Counterclaim, ¶ 18; MSA, Preamble and handwritten note on Exhibit A thereto). The wind farms governed by both the FSA and the MSA were to be identified in a Statement of Work (hereinafter, "SOW") issued by Gamesa. (*See e.g.*, FSA § 2.1;

---

[2] While the Counterclaim's final count is labeled as Count XXII, the Counterclaim asserted two separate counts for Count XII.

[3] For purposes of this Motion only, the allegations of the Counterclaim are asserted herein as accurate. Gamesa preserves and reserves its right to deny all such allegations.

[4] A true and correct copy of the FSA is attached hereto as Exhibit A and cited to as Ex. A or FSA, §__. The pricing information and technical descriptions of the work are redacted to protect confidentiality.

MSA, § 2.1).  Pursuant to the MSA, any proposed "Statement of Work shall become effective only upon execution by authorized representatives" of Gamesa and Outland.  (MSA, § 2.1).

### 1. Statements of Work Were Executed Under Both the FSA and MSA.

Under the FSA, SOWs were executed as follows:

(1)　Floating Crews at Mendota Hills, GSG Wind Farm, Providence Heights Wind Farm, Top of Iowa Wind Farm, Winnebago Wind Farm and Barton Wind Farm for three years at a certain price per hour;

(2)　Barton Fixed Crews for two years for seven (7) crews at a certain price per year, plus a certain price for overtime;

(3)　Winnegao Crew for two years for one fixed crew or two technicians at a certain price per year, plus a certain price for overtime;

(4)　Top of Iowa Fixed Crews for two years for four (4) fixed crews or eight (8) technicians at a certain price per year, plus a certain price for overtime; and

(5)　Providence Heights Fixed Crews for two years for three (3) fixed crews or six technicians at a certain price per year, plus a certain price for overtime.

(Ex. A).

Under the MSA, SOWs were entered as follows:

(1)　Cayuga Ridge Wind Farm for two years for a certain monthly O&M fee, for large corrective work for a certain monthly price per event, and for design modification work for a price to be agreed upon (MSA, Ex. C thereto); and

(2)　Buffalo Ridge Wind Farm in South Dakota for two years for a monthly O&M fee, for large corrective work for a certain monthly price per event, and for design modification work for a price to be agreed upon.  (Ex. B).

According to Steve Scott, President and CEO of Outland, there was an overlap in time between the work that was done under the FSA's SOWs and the work that was done under the MSA's SOWs. (Ex. E, Deposition of Steve Scott, dated February 6, 2012 (hereinafter, "Scott Depo."), pp. 60-61 ("Q. So at the time you start work at Cayuga Ridge under the November of 2009 agreement, right, is Outland still doing work at the other Iberdrola sites, Top of Iowa, Providence Heights, Winnebago and Barton . . . [u]nder the Framework Services Agreement? . . . A. If memory serves, I believe that there was overlap.")).

> **2.** ***Purchase Orders Issued by Gamesa for Transactional Work Less Than Two Years Were Subject to Gamesa's Terms and Conditions, Not SOWs, the FSA, or the MSA.***

After execution of the FSA, Gamesa issued purchase orders to Outland for "technical support;" work that was not the subject of any SOW. (Scott Depo., pp. 47-49 ("Q. Now, once these -- the Framework Services Agreement was executed in 2008, did, did Outland do any work for Gamesa other than work under this Framework Services Agreement? A. I believe that Outland would have provided other technical support for Gamesa outside of the FSA. . . . Q. How would Outland get paid for that work? A. . . I believe we would have provided a work estimate for the scope requested. . . . And that work estimate would have been provided to Gamesa. Gamesa would have accepted that work estimate or rejected it. And then, in turn, if accepted, Gamesa would issue a purchase order.")).

According to Mr. Scott, the technical support work completed under the Gamesa purchase orders would not have been subject to the terms and conditions of the FSA. (Scott Depo., pp. 51-52 ("Q. Did you ever have any discussions with anyone at Gamesa regarding whether this agreement [the FSA] applied to that [technical support] work or whether it didn't?

A. . . To the best of my knowledge, those other technical services described would have been managed through the work estimate, P.O. process.")).

Mr. Scott also admits Outland would have done "transactional work" for Gamesa that was not subject to either the FSA or the MSA under the work-estimate-purchase order-invoice process for work that was generally less than two years.  (Scott Depo., pp. 61-63 ("Q. Was Outland doing work for Gamesa that wasn't covered by either the Maintenance Services Agreement or the Framework Services Agreement after November of 2009?  . . . A.  Outland provided services to Gamesa on a transactional basis from September of 2006 through call it April of 2011. . . . Q. . .  Can  you describe to me what you mean by a transactional basis? A. Transactional work is work that we characterize as work governed by a simple purchase order, work estimate and a purchase order.  Less than—a commitment of less than two years. . . . I would, I would clarify that statement.  Transactional work we loosely define as work performed where there's a P.O. that governs a work estimate—a work estimate and P.O. that governs the transaction.  Generally speaking, that's less than two years.")).

Unless issued under a SOW, Gamesa's purchase orders to Outland were governed by the General Conditions in the purchase order and Gamesa's General Conditions of Purchase printed on each purchase order and found on Gamesa's Web site.  (Ex. C, Affidavit of Gary Stansbury (hereinafter, "Stansbury Aff."), ¶ 7; Ex. D; Ex. P).

Mr. Scott admits Gamesa's General Conditions and General Conditions of Purchase apply to Gamesa's purchase orders.  (Scott Depo., p. 72 ("A. If Gamesa issued a purchase order and there were terms and  conditions attached to that purchase order, those terms and conditions would have governed that transaction.")).

Even Cameron Winton, ORE's Director of Contract Management, admits Gamesa's purchase orders not issued under an SOW are governed by Gamesa's terms and conditions. (Ex. F).  In that e-mail, Mr. Winton states, "So, for sites where Outland and Gamesa do not have an SOW in place under a long-term contract, it's the 'Gamesa Conditions of Purchase' available at that link that apply."  The "link" referred to is an Internet site where Gamesa's Conditions of Purchase may be viewed.  (Ex. D).

Gamesa's General Conditions of Purchase specifically state that the Supplier's acceptance of the purchase order is acceptance of an offer and no different or additional terms contained in any proposal by the Supplier are effective.  (Ex. D, ¶ 3).  Further, no amendments or modifications of the purchase order are binding upon Gamesa unless in writing and signed by a duly authorized officer or representative of Gamesa.  (Ex. D, ¶ 3).

### 3. *Gamesa Issued an 11-Month Purchase Order for the Work at Big Horn II, Not a Statement of Work Under the MSA.*

Gamesa never issued a SOW under the MSA for the Big Horn II site.  (Stansbury Aff., ¶ 13).  Mr. Scott admits no SOW was executed under the MSA for Big Horn.  (Scott Depo., pp. 65-66 ("Q.  So the Maintenance Service Agreement from November of 2009 has a statement of work for Cayuga Ridge and a statement of work for Buffalo Ridge, right?  Were there any other — . . . do you know of any other statement of work Exhibit C that was executed under the November 2009 agreement? . . .  THE WITNESS:  No.")).  Rather, Gamesa issued Purchase Order No. 40402482 for the work at Big Horn II for a term of 11 months (hereinafter, the "Big Horn II PO").  (Doc. 201-10; Ex. G).

### 4. *The FSA, the MSA and the Big Horn Purchase Order All Expired.*

The FSA was effective on October 3, 2008 and, pursuant to Section 4.1, would automatically expire one (1) month after Outland completed performance of services under the

last SOW issued.  (Ex. A, § 4.1).  As set forth above, all of the SOWs issued under the FSA were for two-year terms, which would expire, at the earliest, in October of 2011.

The term for the MSA was for two years, from January 1, 2010 to December 21, 2011. (MSA, Preamble).

The Big Horn II PO was issued on February 7, 2011 for a term of 11 months. (Doc. 201-10; Ex. G).  Pursuant to the General Conditions of Purchase, the terms of the purchase orders "expire according to their own terms upon provision by Supplier of the last of the Goods and/or Services contemplated under a Contract or Order."  (Ex. D, ¶ 43).  The last date Outland was contemplated to provide services at Big Horn II was January 31, 2012.  (Stansbury Aff., ¶¶ 9-11; Exs. O-P).

### 5. *Outland's Work at Big Horn II Was Subject to Its Compliance With Safety Laws and Rules.*

Regardless of whether Outland's work at Big Horn II was subject to the provisions of the FSA, the MSA or the Gamesa's General Conditions of Purchase, Outland was required to comply with all safety laws and rules as a material term of its relationship with Gamesa.  Under the FSA, Outland's personnel were required to comply with all health and safety rules and directives of Gamesa or the Project Owner and with all applicable laws for the safety of persons or property (hereinafter, the "FSA Safety Provision").  (Ex A, § 2.13).  In addition, under the provisions of the FSA, Outland was solely responsible for the protection and safety of its employees, for the final selection of safety methods and for instruction of employees on health and safety equipment.  (Ex. A, § 2.13).  Under the terms of the FSA, if Gamesa determined in its sole discretion that Outland was not complying with applicable safety measurers or putting its employees or anyone else at risk, Gamesa had the right to take any action necessary, including causing Outland to immediately leave the premises where the services were being performed.

(Ex. A, § 2.13). Further, under Sections 4.3.1 and 4.4, upon a breach of a material provision of the FSA, Gamesa was entitled to terminate the FSA after notice and a period for curing the default. (Ex. A, §§ 4.3.1, 4.4).

Similarly, under the MSA, Outland was required to "train all its personnel on health and safety, and on industry technical standards, in order to allow its employees to effectively perform O&M Services" and to comply with all "applicable federal, state or local health and safety laws and regulations" (hereinafter, collectively, the "MSA Safety Provision"). (Counterclaim, ¶¶ 22-23; MSA, §§ 2.2, 4.2-4.5).

Under the General Conditions of Purchase, Outland was obligated to "abide by all applicable laws with respect to its employees . . . including but not limited to health and safety" (hereinafter, "PO Safety Provision"). (Ex. D, ¶ 34). The General Conditions of Purchase specifically provide, "In the event of a default or breach of Buyer's or Seller's obligations hereunder, Buyer or Supplier may totally or partially cancel the Contract or Order without incurring any cost by providing written communication to the defaulting party [in the case of a] material breach by the defaulting party under the Contract or Order." (Ex. D, ¶ 44).

### 6. *Outland's Work at Big Horn II Was Subject to Compliance With Gamesa's Confidentiality Provisions*

Section 9.1 of the FSA provides that any technical or pricing information regarding the Turbines, the O&M Manual and the terms of the FSA are confidential and the parties agree to hold the information in confidence for a period of three (3) years from the termination date of the FSA, or October 3, 2011 (hereinafter, the "FSA Confidentiality Provision"). (Ex. A, § 9.1).

Similarly, the MSA contains a comprehensive confidentiality provision (hereinafter, the "MSA Confidentiality Provision"). (MSA, § 7.8). Pursuant to the MSA Confidentiality Provision:

> All technical, economic or commercial information related to Gamesa, its
> affiliates, its Customers or its products, as well as any documentation (e.g.,
> training manuals, troubleshooting manuals, etc.) which [Outland] might be
> provided under this Agreement or any other agreement with Gamesa, is of a
> confidential nature and shall be the exclusive property of Gamesa (the
> "Confidential Information"). However, training manuals and other materials
> created by [Outland] based on non Confidential Information received from
> Gamesa, or based on experience gained while working for Gamesa, shall be
> excluded from the definition of Confidential Information. Such training manuals
> and other materials created by [Outland] based on information received from
> Gamesa shall not be not be [sic] used by [Outland] for a period of one (1) year
> from the termination in the Agreement, in whole or in part. [Outland] shall not
> disclose any such Confidential Information to third parties and shall not use it
> directly or indirectly for any purpose other than those stipulated in this
> Agreement.

(MSA, § 7.8). The MSA Confidentiality Provision continues in-force for a period of three years

after expiration or termination of the MSA for any reason. (MSA, § 7.8).

The General Conditions of Purchase also contain a confidentiality provision (hereinafter,

the "PO Confidentiality Provision"):

> Buyer and Supplier each agree to keep confidential all information
> provided by the other party which the receiving party knows or
> reasonably should know to be confidential or proprietary
> information or documentation of the disclosing party (collectively,
> "Confidential Information"), including but not limited to the
> existence and terms of the Contract, Order and these GCP. . . .
> Supplier shall limit disclosure of Buyer's Confidential Information
> to those employees, agents or subcontractors with a need to know
> in order to fulfill Supplier's obligations under the Contract or any
> Order . . .

(Ex. D, ¶ 38).

### 7.    *Both the FSA and the MSA Have Non-Compete Provisions.*

Section 11.1 of the FSA provides that, during the term of the agreement and for a period

of one year following termination, Outland would not solicit or otherwise offer to perform

services substantially similar to the "Services" in connection with any wind turbine equipment

manufactured by Gamesa or its affiliates directly to any client or customer of Gamesa

(hereinafter, the "FSA Non-Compete"). (Ex. A, § 11.1, p. 22). "Services" are defined in the agreement as "all wind farm operation, maintenance and repair services (the "Services") provided by Contractor [Outland] to Gamesa during the term of the Agreement." (Ex. A, § 2.1, p. 2).

Section 4.8.10 of the MSA provides that Outland "cannot directly or indirectly contract with the [(sic)] Gamesa's Customer(s) on each of the wind farms to perform work which is equal to, analogous with or similar to the work that Contractor is to perform pursuant to this Agreement" (hereinafter, the "MSA Non-Compete"). (MSA, § 4.8.10, p. 12). "Customer" is defined in the first "Whereas" clause as the owners of wind-powered electrical generation facilities located throughout the United States to whom Gamesa provides wind farm operation and maintenance services. (MSA, Preamble). "Customer" is also defined in the definition section of the MSA as "the owner of the Turbines and/or Project." (MSA, § 1.1). "Project" is defined as a "wind-powered generation facility at which Contractor is providing O&M Services under this Agreement. The Projects will include those wind farms listed in Exhibit A." [5] (MSA, § 1.1). Importantly, these two definitions are not in conflict or ambiguous. Since the MSA Non-Compete prohibits contracts with "Gamesa's Customer(s) on each of the wind farms," not just "Customers on each of the Projects," it means any owner of a Turbine, not just the owners of the Projects under the MSA.

### C. Outland's Multiple Material Breaches

To the extent the Court finds the MSA is applicable to Outland's work at Big Horn II *and* that the MSA provides for a two-year term for that work, Outland breached material provisions of that agreement justifying Gamesa's termination.

---

[5] Exhibit A to the MSA is entitled "Projects Included Under Framework Services Agreement" and a handwritten note states, "To be agreed upon by the Parties on a project by project basis." (MSA, Exhibit A thereto, p. 21).

### 1.     *Outland Breached the MSA's Safety Provision.*

On May 12, 2011, Gamesa sent Outland notice of its breach and default under the MSA, due in part to Outland's "fail[ure] to perform O&M Services in accordance with the health, safety and environmental requirements of the MSA and applicable law." (Counterclaim, ¶¶ 113-115, 121; Ex. H). Most notably, on April 8, 2011, Outland was issued six citations by the Occupational Safety and Health Administration (hereinafter, "OSHA") stemming from Plaintiff's accident at the Cayuga Ridge wind farm on October 20, 2010. (Counterclaim, ¶¶ 105, 115, 121; Ex H). These violations breached the MSA's Safety Provision, including Sections 2.1, 4.2, 4.3 and 4.4 of the MSA. (Ex. H).

Specifically, OSHA found Outland violated 29 C.F.R. § 1910.269(d)(8)(ii)(D)[6] on multiple occasions. (Ex. I). OSHA found "Outland had documented 86 instances where Iberdrola technicians had placed locks on tower turbine transformer energy isolation devices for Outland technicians." (Ex. I, p. 20). "Through consented recorded employee statements [OSHA] discovered that this was a common practice at [Cayuga Ridge], and other sites where Outland was performing work for Gamesa and Iberdrola." (Ex. I, p. 20). OSHA found "Outland management was aware of the hazardous conditions, was aware of the OSHA requirements for protecting employees from hazardous energy and *continued to show intentional disregard to employee safety.*" (Ex. I, p. 20).

Even after the horrific accident at Cayuga Ridge, and OSHA's multiple willful and serious violations citations, Outland still disregarded the applicable Lock Out Tag Out safety requirements at Big Horn II. In an e-mail dated November 11, 2011, Gamesa employee Josh Emerson wrote to his supervisor Kaylen Katser at Gamesa that he had observed a clear

---

[6] 29 C.F.R. § 1910.269(d)(8)(ii)(D) requires that each employee affix a personal lock or tag to the group lockout device, group lockbox, or comparable mechanism when he or she begins work and then remove the log or tag when he or she is done working on the machine or equipment being serviced.

violation of the Lock Out Tag Out procedure at Big Horn II in that only one lock was placed on the equipment, when three separate locks should have been attached. (Ex. R). Mr. Emerson wrote that when he addressed the violation with the Outland employees, they did not seem to care. (Ex. R). This e-mail was forwarded by Mr. Katser to the Outland site supervisor, Mr. Alexander. (Ex. R). According to the deposition testimony of Josh Howard, the Gamesa Account Manager and Mr. Alexander's supervisor at Outland, he was never made aware of this issue and he agrees that the failure of the Outland employees to place three separate locks on the equipment was a violation of the proper Lock Out Tag Out procedure. (Ex. S, Deposition Testimony of Josh Howard, February 6, 2012 (hereinafter, "Howard Depo."), pp. 6-7, 33-36).

Pursuant to MSA Sections 6.1 and 6.2, because Gamesa determined the violations of the MSA's Safety Provision were "critical issues per Gamesa quality inspections," Gamesa provided Outland until May 19, 2011 in which to cure all defaults of the Safety Provision within five working days thereafter. (Ex. H). In response to Gamesa's notice of breach and default of the Safety Provision, Outland admitted that "OSHA has indeed issued citations to Outland arising out of the accident at the Cayuga Ridge wind farm in which Outland technician Aaron McCoy was injured." (Ex. J). Despite this admission and the egregious violations cited by OSHA, Outland denied it violated the MSA Safety Provision and therefore did not cure the breach and default. (Ex. J).

### 2. Outland Breached the MSA's Non-Compete and Confidentiality Provisions.

On July 21, 2011 and August 31, 2011, Gamesa sent Outland notice of its further breach of the FSA and MSA in violating the FSA's and MSA's Non-Compete and Confidentiality Provisions. (Exs. K-M). Gamesa learned that "Outland bid on the Duke North Allegheny Project and the Infigen Multi-Site Projects." (Opposition, Ex. M). Upon information

and belief, Gamesa also learned "Outland has met with, and/or plans to meet with, Gamesa's customers, including but not limited to Horizon Wind Energy LLC, Nedpower Mount Storm LL and E.ON Climate & Renewables North America, LLC, and/or their respective parents, subsidiaries or affiliate entities, in an attempt to solicit business or otherwise perform services similar to the work Outland has been contracted to perform pursuant to the [] MSA."  (Ex. M; Stansbury Aff., ¶ 21).  The August 31, 2011 letter also provided Outland notice of Outland's breach of the FSA's and MSA's Confidentiality Provisions because, upon its information and belief, "Outland has, in the course of wrongful solicitation of Gamesa customers, divulged Confidential Information of Gamesa."  Gamesa demanded Outland cease and desist its breaches of the FSA's and MSA's Non-Compete and Confidentiality Provisions.  (Ex. M; Stansbury Aff., ¶ 21).  Outland ignored the demand.  In fact, based upon implication from conversations with customer representatives, Outland has obtained one or more contracts for work from Gamesa's customers.  (Stansbury Aff., ¶ 21).

On December 7, 2011, Gamesa's counsel sent Outland notice of its continued breach of the FSA's and MSA's Non-Compete and Confidentiality Provisions.  (Doc. 201-24).  Gamesa learned Outland was "openly competing against Gamesa on the [EDP Renováveis/Horizon (hereinafter, "EDPR")] proposal and has, or plans to, submit a bid for the operations and maintenance at the Horizon Mesquite and Post Oak wind farms."  (Doc. 201-24; Stansbury Aff., ¶ 24).  Gamesa demanded again that Outland "immediately cease and desist from soliciting or contracting with any Gamesa customers, including but not limited to, EDPR, and that all disclosure of Confidential Information likewise immediately cease."  (Doc. 201-24).

After allowing Outland repeated opportunities to rectify its breaches of the Safety, Non-Compete and Confidentiality Provisions of the FSA and MSA and Outland's blatant

disregard of said opportunities, on January 18, 2012, Gamesa's counsel sent Outland notice of Gamesa's termination of the MSA. (Ex. N).

From and after the date of the MSA, November 19, 2009, Gamesa issued approximately 250 purchase orders to Outland. Each such purchase order contains the same language in the General Conditions of Purchase. Without burdening the Court with copies of each and every one of the purchase orders, Gamesa submits one example of a purchase order for Outland to provide work for each of the Customers.[7] (Ex. Q).

### D. The Big Horn II Work Was Negotiated as an 11-Month Purchase Order, Nothing More

In late January 2011, Outland and Gamesa negotiated the terms under which Outland would perform work at the Big Horn II site. (Doc. 200-2, Affidavit of John Wynn (hereinafter, "Wynn Aff.) ¶ 3). On or about January 26, 2011, the parties reached an agreement as to the price of the services Outland would provide at Big Horn II. (Doc. 201, ¶ 18; Doc. 201-6). A SOW governed by the MSA was not issued.[8] (Doc. 201, ¶ 38). Instead, on February 7, 2011, Gamesa issued purchase order number 40402482 for one month's work at Big Horn II. (Docs. 201, ¶ 23; 201-9). Gamesa's purchase orders state:

> Where existing, this Purchase Order shall be governed by the terms and conditions of the supply agreement between Gamesa and Supplier. In the absence

---

[7] Since Outland appears to admit that is communications with Horizon/EDPR are at issue (Motion, ¶ 19), no purchase orders from EDPR are submitted, but can be produced upon request. Further, the price and description of the work are redacted to protect the customers' confidential information.

[8] Outland argues that "[i]t was the intention of Outland and Gamesa that the agreement between Outland [and Gamesa] would be governed by the MSA, however, because of the urgent need of Gamesa, the parties waived the requirement of an SOW, but expected that an SOW would be signed which would act as a confirmation of the agreement that the parties had reached." (Doc. 201, ¶ 19). Outland has put forth no evidence that the parties intended the MSA to govern Big Horn II. Outland submits e-mails and makes anargument based on other facts and use of the word "contract" or "contracts"; however, none of the e-mails specifically refer to the MSA. Moreover, a purchase order is a contract. (*See e.g.*, Opposition, Ex. I ("This Purchase Order is Gamesa's offer to purchase the goods and/or services described in the Purchase Order. . . . Please acknowledge receipt and acceptance of the purchase order . . . .")). Furthermore, Gamesa put forth no communications from Gamesa that it "waived" issuance of a SOW or that it intended to at a later date. Again, Outland supplies only conjecture and speculation.

of any such supply agreement between the parties, this Purchase Order shall be governed by the Gamesa Conditions of Purchase available at [Gamesa's website] (hereinafter, the "General Conditions").

(Docs. 201, ¶ 25; 201-9).  Pursuant to the General Conditions of Purchase, a purchase order "expire[s] according to their own terms upon provision by Supplier of the last of the Goods and/or Services contemplated under a Contract or Order, except as otherwise set forth below." (Ex. D, ¶43).  Gamesa issued a subsequent 11-month purchase order, number 40402482, on or about March 21, 2011.  (Docs. 201, ¶ 24; 201-10; Ex. G).

On or about January 4, 2012, Gamesa sent Outland notice that "the last day O&M services will be needed for Gamesa's Big Horn II wind farm will be January 31, 2012 as the current [purchase order] (PO # 4042482) has been exhausted."  (Ex. O).  Gamesa indicated that "[a] new [purchase order] will be issued to cover the 8 technicians currently on site through January 31, 2012."  (Ex. O).  Gamesa asked that the "Outland crews [] be demobilized by January 31, 2012."  (Ex. O).  Accordingly, the Purchase Order, number 40499360, was issued on or about January 19, 2012, covering Outland's services until January 31, 2012.  (Doc. 201, ¶ 33; Ex. P).  Pursuant to the General Conditions of Purchase, the Purchase Order was to expire on January 31, 2012.

## III.   ARGUMENT

### A.     A Preliminary Injunction Is an Extraordinary Remedy

A preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

In assessing whether preliminary injunction is warranted, [a court] must consider whether the party seeking the injunction has demonstrated that: 1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing

party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest.

*St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Linnemeir v. Bd. of Trs. Of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001)). "As the Seventh Circuit has noted, preliminary injunctive relief is not appropriate if its gives to a plaintiff 'the actual advantage which would be obtained in a final decree.'" *Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 962 (N.D. Ill. 2010) (quoting *W.A. Mack, Inc. v. General Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958)). "This adage applies to the balance of equities, because granting a plaintiff final relief at the outset of the case would completely undercut the protections due a defendant." *Id*. "Not only would the plaintiff receive final relief without meeting his burden, but the defendant would often suffer a harm that cannot be undone." *Id*.

> **B.     Outland Cannot Succeed on the Merits**

"For purposes of a preliminary injunction [the movants] have the burden of demonstrating a reasonable likelihood of success of success on the merits." *Protect Marriage IL v. Orr*, 458 F. Supp. 2d 562, 567 (N.D. Ill. 2006) (citing *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 619 (7th Cir. 2004)). *See also MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 753 (7th Cir. 2007) (Sykes, J., concurring) ("This case advanced beyond the pleading stage to the entry of a preliminary injunction, which of course requires plaintiff to shoulder the burden of establishing a likelihood of success on the merits.") (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). Outland has the burden to establish a likelihood of success on the merits of their claims.

Establishing a likelihood of success on the merits "usually requires the [movant] to move beyond mere allegations." *MainStreet Org.*, 505 F.3d at 753. Outland merely makes conclusory

statements with no evidentiary proof to substantiate its claims. Further, Outland does not adequately demonstrate the MSA applies to the work at Big Horn II, and it is clear from the MSA's plain language that it does not. Nor does Outland demonstrate that even if the MSA did apply, the breaches of the Safety, Non-Compete and Confidentiality Provisions were not material breaches of the MSA such that Gamesa had the right to terminate the MSA, which clearly they were. This is Outland's burden to meet, and it cannot do so.

### 1. The MSA Does Not Govern Big Horn II; the 11-Month Purchase Order Governs.[9]

"'The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself.'" *Lesko v. Frankford Hosp.-Bucks County*, 15 A.3d 337, 342 (Pa. 2011) (quoting *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006)). "An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." *Yocca*, 854 A.2d at 436 (citing *HCB Contractors v. Liberty Place Hotel Assocs.*, 652 A.2d 1278, 1279 (Pa. 1995)) and *McGuire*, 534 A.2d at 117, *aff'd*, 534 A.2d 115 (1988).

---

[9] In evaluating the applicability of the MSA to Big Horn II, this Court should apply the law of Pennsylvania. Pursuant to Section 7.2 of the MSA, the MSA "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the conflict of laws principles thereof." While 815 ILCS 665/10 precludes enforcement of choice-of-law provisions for construction contracts, it only precludes enforcement when the construction at issue is performed in Illinois. *See* 815 ILCS 665/10; *see also* 24 ILPRAC § 10:32. All work performed on Big Horn II is completed at its location—the State of Washington. Accordingly, this Court should apply Pennsylvania law. *See Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 581, 948 N.E.2d 132, 148 (2011) ("We should give effect to a choice-of-law provision in a contract unless the contract chooses a foreign law that is dangerous, inconvenient, immoral or contrary to the public policy of the local government."); *see also Parrott Mechanical, Inc. v. Rude*, 118 Wash. App. 859, 863, 78 P.3d 1026, 1029 (2004) (enforcing choice-of-law provision in construction contract and applying Idaho law to construction performed in Washington).

Gamesa and Outland intended the MSA to represent the entire agreement as to Outland's work at Cayuga Ridge and Buffalo Ridge and intended the Big Horn II Purchase Orders to represent the entire agreement as to Outland's work at Big Horn II. Outland has failed to demonstrate there is any reason for the Court to look beyond the four corners of the MSA and the purchase orders to determine the parties' intent and consider any of the extrinsic evidence Outland references in the Motion. In fact, the section of MSA aptly entitled <u>Entire Agreement</u>, states that "[t]his Agreement, including the SOWs, schedules and exhibits attached hereto, contains the entire agreement between the Parties." (MSA, § 7.5). No SOW for work at Big Horn II is attached to the MSA. Outland admits no such SOW was ever executed. (Doc. 201, ¶38). Further, the MSA provides that "[n]o amendments or modifications of this Agreement shall be valid unless evidenced in writing and signed by a duly authorized representative of both Parties." (MSA, § 7.6).

As stated above, "'[i]n cases of a written contract, the intent of the parties is the writing itself.'" *Lesko*, 15 A.3d at 342 (quoting *Ins. Adjustment Bureau*, 905 A.2d at 468. "Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436-437 (Pa. 2004) (citing *Bardwell v. Willis Co.*, 100 A.2d 102, 104 (Pa. 1953) and *McGuire v. Schneider*, 534 A.2d 115, 117-118 (Pa. Super. 1987)). "'All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements

cannot be added to nor subtracted from by parol evidence.'" *Yocca*, 854 A.2d 425, 436 (Pa. 2004) (quoting *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924)).

Outland relies upon six pieces of extrinsic evidence to attempt to establish an intention on the part of Gamesa to issue a two-year SOW for the work at Big Horn. While Gamesa continues to assert that extrinsic evidence is inadmissible to establish any additional terms to MSA, which is a fully integrated document, Gamesa addresses Outland's extrinsic evidence here.

Outland relies upon its January 25, 2011 "work estimate," which states "[p]urchase of services under this Work Estimate constitutes acceptance of the following terms and conditions . . . . The stated pricing assumes that Gamesa will enter into a 2-year contract with Outland." (Doc. 201-8). Gamesa rejected Outland's "work estimate" and issued a purchase order with an 11-month term. (Doc. 201-10). Gamesa's purchase order specifically states: "This Purchase Order is Gamesa's offer to purchase the goods and/or services described in the Purchase Order. . . . Buyer hereby objects to any different or additional terms contained in any proposal by Supplier or response by Supplier to this Purchase Order. Supplier's . . . commencement of performance thereunder shall constitute Supplier's acceptance of all terms and conditions herein . . . ." (Ex. D, ¶ 3).

Outland relies upon an e-mail from a Gamesa employee notifying Outland that Gamesa had accepted Outland's proposed price and request for the names of the technicians providing the "2-yr warranty as agreed," as evidence of acceptance of the two-year term. (Doc. 201-6). This extrinsic evidence is inadmissible and irrelevant. First, every e-mail from non-authorized Gamesa employees contains a disclaimer stating: "The content of the present communication, and its annexes, is for informational purposes only and does not in any case constitute a binding offer, acceptance or opinion for Gamesa unless so set forth in separate document[s] subscribed

by a representative of the company with sufficient faculties to do so." Second, the e-mail was sent from a non-lawyer, Matt Pimentel of Gamesa, whose title is clearly indicated as "Midwest CRO Manager," to Mr. Winton, a lawyer and the Vice President and General Counsel and Director of Contract Management for Outland.[10] Third, as stated above, the Purchase Order is an integrated contract.

Outland relies upon a February 24, 2011 internal Outland record of a communication from Leni John of Gamesa that Gamesa will be issuing a SOW for Big Horn II under the MSA. This double hearsay document is not admissible for the truth of the matter. *See* F.R.E. 802. Further, Mr. John had no authority from Gamesa to indicate any such intention, if he did so. (Stansbury Aff., ¶ 14). Finally, Gamesa's General Conditions of Purchase prohibit oral modification of the Purchase Order. (Ex. D, ¶ 4).

Outland relies upon a February 26, 2011 e-mail from Outland to Gamesa documenting that Outland is waiting for an SOW for Big Horn under the MSA. This document proves nothing other than Outland wanted Gamesa to issue an SOW. That is not enough to establish a contract.

Outland relies upon a March 21, 2011 e-mail from Leni John to Outland stating he is working with Gamesa legal to obtain a SOW for Big Horn. This document proves nothing other than that Gamesa legal was perhaps contemplating whether or not to amend the terms of the Purchase Order or the MSA.

Outland relies upon an April 6, 2011 e-mail from Gary Stansbury, where he references Big Horn in the same context as Cayuga Ridge and Buffalo Ridge. Again, this document is even more attenuated than the others. Nothing in the e-mail provides any additional or different terms

---

[10] While Mr. Winton was fully aware of in-house counsel for Gamesa, Mr. Wynn, and his role in contract negotiations, Mr. Winton chose to communicate with non-lawyers in the context of negotiating the Big Horn Purchase Order and he did so without disclosing to the Gamesa representatives that he was a lawyer representing Outland. The only designation on his e-mail communications is "Director of Contract Management."

from the purchase order governing the Big Horn II work and certainly does not unequivocally indicate an intention to modify or amend the Big Horn II Purchase Order. (Stansbury Aff., ¶ 15).

The parties had no intention to make any amendments or modifications to the MSA, and Outland has failed to present any writing demonstrating they did. Gamesa did not issue a SOW governed by the MSA for the work at Big Horn II, and the parties did not modify their course of dealing governed by the MSA. Therefore, work at Big Horn II is not governed by the MSA.

### 2. Even if MSA Applies to Big Horn II, Gamesa Had Authority To Terminate the MSA.[11]

While it is clear the MSA did not apply, even if the MSA did apply, Gamesa had authority to terminate the MSA because Outland violated the MSA by failing to follow requisite safety laws, by engaging in negotiations with Gamesa's customers and by disclosing Gamesa's confidential and propriety information. Outland's arguments to the contrary are completely without merit. Pennsylvania courts have "long recognized the established precept of contract law that a material breach of contract relieves the non-breaching party from any continuing duty of performance thereunder." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009) (citing *Berkowitz v. Mayflower Secs.*, 317 A.2d 584, 586 (Pa. 1974)). "It is equally well established, that '[a] party also may not insist upon performance of the contract when he himself is guilty of a material breach of the contract.'" *LJL Transp.*, 962 A.2d at 648 (quoting *Ott v. Buehler Lumber*, 541 A.2d 1143, 1145 (Pa. Super. 1988)). "The right to terminate a contract after a material breach by another party is provided by law independent of the contract." *Nutri-Sys., Inc. v. Hirschinger*, Civ. A No. 83-0562, 1986 WL 10793, at *7 (E.D. Pa. Sept. 30, 1986).

---

[11] Gamesa's counsel raised this issue at the hearing on January 31, 2012 on Outland's Motion. A true and correct copy of the relevant portions of the January 31, 2012 hearing transcript is attached hereto as Exhibit U.

"Pennsylvania law permits the immediate termination of [] a contract when there is a material breach of the contract so serious it goes directly to the heart and essence of the contract, rendering the breach incurable." *Id.* at 641. *See also Falls v. State Farm Ins. Mut. Auto Ins. Co.*, 774 F. Supp. 2d 705, 711 (M.D. Pa. 2011) ("[T]he Pennsylvania Supreme Court decided that a breach of trust can be a material breach that is so serious it goes to the heart and essence of the contract, rendering the breach incurable.") (citing *LJL Transp.*, 926 A.2d at 639). This is true "even if the contract includes an express provision granting the breaching party the right to cure before the contract is terminated." *Id.* Outland's breaches of the MSA's Safety, Non-Compete and Confidentiality Provision constitute material breaches of the MSA.

The MSA's Safety, Non-Compete and Confidentiality Provisions are all integral to the relationship between Gamesa and Outland. Standing alone, any one of Outland's breaches of these provisions would justify Gamesa's termination of the MSA, and Outland's egregious behavior in breaching all three provisions certainly justifies Gamesa's action to terminate. *See Larken, Inc. v. Larken Iowa City Ltd. P'ship*, 589 N.W.2d 700, 701 (Iowa 1999) ("While profitability is a significant purpose of the management agreement, the honesty of the parties is also an integral, although unexpressed, component of the agreement.")

Particularly, Outland's actions and breaches of the MSA's Safety, Non-Compete and Confidentiality Provisions are "so grave that [they] could not help but have irreparably damaged the trust between the parties." *See Falls*, 774 F. Supp. 2d at 712. Given these breaches, it is impossible for Gamesa to continue to do business with Outland. Gamesa trusts its contractors with its employees' safety and its valuable confidential information and allows them unsupervised access to its customers. Gamesa expects its contractors to abide by the MSA and any other applicable agreement to protect the safety of the employees, Gamesa's confidences and

Gamesa's customer relationships. Gamesa trusts Outland will abide by the terms of the MSA, and Outland has completely breached this trust. The only remedy Gamesa has to prevent further violations of the Lock Out Tag Out procedures and other safety issues, further dissemination of Gamesa's confidential information and to protect its customer relationships is to immediately terminate the MSA to prevent additional material breaches from occurring. All trust has been lost, and the MSA can no longer continue.

### C. Outland Will Not Suffer Irreparable Harm and Has an Adequate Remedy at Law

A party suffers irreparable harm when "a party cannot be made whole by a damages award at the conclusion of trial." *Vogel v. Am. Soc. Of Appraisers*, 744 F.2d 598, 599 (7th Cir. 1984). In other words, "to establish irreparable harm plaintiff must show that it has no adequate remedy at law, meaning monetary damages cannot adequately compensate the injury and the injury cannot be measured by pecuniary standards." *USA Satellite & Cable, Inc. v. North American Cable Equipment, Inc.*, No. 09 C 2067, 2011 WL 1692391, at *8 (N.D. Ill. May 2, 2011). "Generally, in a breach of contract action, irreparable harm is established when the injury is reputation or goodwill of the business or when defendant is insolvent . . . ." *Id.*

In this matter, Outland has an adequate remedy at law—a breach of contract action for damages. Outland argues the alleged Big Horn II contract does not expire until October 23, 2012. Outland certainly could immediately sue for anticipatory breach or even breach of contract for what it considers is the remaining term of the alleged contract.

While not denying it could sue for breach of contract, Outland argues that without a preliminary injunction, it "would face being put out of business." (Doc. 201, ¶ 93). While various courts have found that a damages remedy would be inadequate if the damage award "come[s] too late to save the plaintiff's business" (s*ee Roland Machinery Co. v. Dresser Indus.,*

*Inc.*, 749 F.2d 380, 386 (7th Cir. 1984), forces a plaintiff out of business (*see Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 588 F. Supp. 2d 919 (S.D. Ind. 2008)) or exposes a plaintiff to immediate bankruptcy (*see Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975), Outland has not put forth any credible or reliable evidence to suggest it would go bankrupt or be forced out of business without the preliminary injunction.

Outland claims that if Gamesa is permitted to "remove Outland from Big Horn II, Outland's lenders will have the contractual right to foreclose on Outland's assets." (Doc. 201, ¶ 72). It further claims the "reduction in revenue would undermine the lender's confidence in Outland and put Outland out of compliance with various financial covenants." (Doc. 201, ¶ 75). However, Outland has not provided any documents or records, let alone affidavits from its lender, attesting that the lenders have the right to, let alone *will*, foreclose on Outland's assets if the Big Horn II contract expires January 31, 2012 as opposed to October 2012. Without evidence from Outland's lenders, it is purely speculative that its lenders will "lose confidence" and "foreclose."

Outland further speculates, without evidentiary support, that "new lenders would be reluctant to extend working capital to Outland and Outland *may* be required to conduct an orderly liquidation of its assets for the benefit of its creditors." (Doc. 201, ¶ 76) (emphasis added). Even assuming Outland would need new lenders, Outland cannot hypothesize what potential lenders would or would not do. Furthermore, Outland even admits it is speculative that it would go bankrupt. Outland's business cannot be entirely dependent on a contract that, if Outland prevails, expires in October 2012. Otherwise, Outland would claim it will be out of business in October 2012 when the supposed contract ends. Outland's entire argument is speculative at best. Accordingly, Outland has an adequate remedy at law—a breach of contract

action. Outland's Motion should be denied. *See Leland v. Morin*, 104 F. Supp. 401, 404 (D.C.N.Y. 1952) ("[A] prayer for an injunction based solely on affidavits should be denied unless the affidavits attest with crystal clarity and without speculation to the imminence of real injury to the movant.").

In this case, the assertions defy common sense. According to Steve Scott, President and CEO of Outland, Outland's revenue in 2011 was over $18 million and it currently has 125 employees. (Scott Depo., pp. 5-6, 16). Outland's debt to Wells Fargo is a revolving credit line in the maximum amount of $2 million and the debt to Allco, a shareholder in Outland's parent company, is $250,000 under a note that is due in "the future." (Scott Depo., pp. 17-18). The entire remainder of the Big Horn II work through October of 2012 is only worth approximately $500,000. That amount of revenue is immaterial in the context of revenue of $18 million. Further, Gamesa asserts it is not the loss of the Big Horn II work that is putting stress on Outland's finances, it is the fact that Outland owes OSHA $378,000 in fines. (Ex. I). Although Outland compromised with OSHA to reduce the severity of the citations, the total amount of the penalties was not reduced. (Scott Depo., pp. 94-95).

Furthermore, while the loss of employment for six technicians in Washington is significant, it is immaterial to Outland's total workforce of 125 employees. Further, despite Outland's assertion to the contrary in the Motion (Doc. 201, ¶ 102), Mr. Howard confirmed Outland would, if the employees desired, find alternative work for them at other sites. (Howard Depo., pp. 54-57). In fact, Outland currently advertises for additional technicians to fill vacancies now. (Ex. T). Obviously, the resources Outland has provided these individuals, such as training, clothing and technology, can be put to use at other locations.

### D. Gamesa Will Suffer Irreparable Harm if It Must Continue To Employ Outland

Despite Outland's assertions to the contrary, "the irreparable harm [Gamesa] will suffer without injunctive relief is greater than the harm [Outland] will suffer if the preliminary injunction is granted." *St. John's United Church of Christ*, 502 F.3d at 625. "If the defendant will not be irreversibly injured by the injunction because a final judgment in his favor would make him whole, the injunction will not really harm him." *Roland Machinery Co.*, 749 F.2d at 287. "But since the defendant may suffer irreparable harm from the entry of a preliminary injunction, the court must not only determine that the plaintiff will suffer irreparable harm if the preliminary injunction is denied—a threshold requirement for granting a preliminary injunction—but also weigh that harm against any irreparable harm that the defendant can show he will suffer if the injunction is granted." *Id*.

Gamesa will be "irreversibly injured" if Outland's Motion is granted. Gamesa no longer needs a subcontractor to provide services at Big Horn II. (Stansbury Aff., ¶ 12). Gamesa will provide the services through its own employees at a significant cost savings over the Outland costs. (Stansbury Aff., ¶ 12). Accordingly, with the imposition of an injunction, Gamesa will be forced to pay Outland $58,062.50 per month for the next nine months to do minimal work, if any work at all. Gamesa will be forced to pay for unneeded services with money it may never recover if Outland does not prevail on its claims. Accordingly, Outland's Motion should be denied.

### E. Substantial Security Is Necessary To Protect Gamesa

If Outland prevails on its Motion, substantial security is necessary to protect Gamesa. A preliminary injunction can only be issued "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Compensation for a wrongfully issued injunction is limited to the amount of the bond." *See Coyne-Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385, 393-94 (7th Cir. 1983). Therefore, "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000). A wrongfully enjoined company seeking to recover the moneys from the injunction bond must still prove its loss, so "an error in setting the bond too high thus is not serious." *Id.* "Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.*

In this matter, the proper security is at least $522,562.50—nine months' worth of services at Big Horn II (February 1, 2012 through October 2012) at $58,062.50 per month. (Ex. P). Outland even concedes its supposed lost revenue is approximately $508,000. (Doc. 201, ¶ 74).

Outland argues "[n]o security should be required from Outland because Gamesa will suffer no damages from imposition of an injunction." (Doc. 201, ¶ 100). Outland is wrong. Gamesa will suffer irreparable harm and damages from the imposition of an injunction without security. Without the protection of security from Outland, Gamesa may have nowhere to turn if Outland is unsuccessful in its case. If Gamesa prevails in this action and Outland's speculation of "going out of business" randomly comes true, Gamesa will not be able to seek recovery from Outland for the wrongful injunction. Accordingly, this Court should require Outland post security with a minimal amount at $522,562.50.

## F.    Disputed Material Facts Require Denial of Injunction and an Evidentiary Hearing

If this Court is inclined to grant Outland's Motion, it should, at the very least, consider whether there is a dispute regarding the material facts. Clearly, the parties disagree as to what contract governs Big Horn II. Similarly, the parties disagree as to whether Outland's actions

allow for Gamesa to terminate the MSA. Because these material facts are disputed, this Court should deny Outland's Motion. A motion for preliminary injunction supported only by written evidence should be denied when the facts are in dispute. *See Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 872 n.5 (2d Cir. 1971) ("[W]e have stated in no uncertain terms that where there are disputed issues of fact, as we believe there are here, a temporary injunction should not issue on the basis of affidavits save in instances of extreme urgency."). At the very least, Outland should be required to put forth its evidence in support of its Motion at an evidentiary hearing where Gamesa may cross-examine Outland's witnesses and this Court can assess their credibility. *See Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940) ("Furthermore we think that a preliminary injunction should not have been granted upon evidence largely in the form of affidavits as was done in the case before us. The evidence was conflicting and the trial judge, in order to enable him to resolve these conflicts, should have been afforded the opportunity of testing the credibility of the witnesses by having the benefit of their cross-examination . . . ."); *see also Cement Enamel Dev, Inc. v. Cement Enamel of New York, Inc.*, 186 F. Supp. 803, 804 (D.C.N.Y. 1960) ("[W]here issues of fact are involved, the drastic remedy of preliminary injunction should not be granted until the facts have been tested out in the crucible of oral examination and cross-examination.").

IV.     **CONCLUSION**

For the foregoing reasons, Outland's Motion for Temporary Restraining Order and For Preliminary Injunction (Dkt. 201) should be denied.

Dated:  February 8, 2012                KUTAK ROCK LLP

                                 */s/ Julie B. Negovan*
                                 Julie B. Negovan, Esq.
                                 Michael T. McDonnell, III., Esq.
                                 Suite 2050
                                 One South Wacker Avenue
                                 Chicago, IL 60606-4614
                                 (312) 602-4100
                                 (312) 602-4101
                                 *Julie.Negovan@kutakrock.com*

                                 ***Attorneys for Defendants***
                                 ***Gamesa Technology Corporation, Inc.***
                                 ***and Third-Party Defendant***
                                 ***Gamesa Wind US, LLC***

## CERTIFICATE OF SERVICE

     I, Julie B. Negovan, Esquire, hereby certify that on the 8th day of February, 2012, I caused to be served the foregoing via the Court's electronic filing system, upon:

          All Counsel on Record

                                 */s/ Julie B. Negovan*
                                 Julie B. Negovan, Esquire