UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AARON MCCOY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GAMESA TECHNOLOGY CORPORATION, INC., | ) |
| GAMESA WIND US, LLC, IBERDROLA | ) |
| RENEWABLES, INC., STREATOR-CAYUGA | ) |
| RIDGE WIND POWER, LLC, | ) |
| | ) |
| Defendants. | ) |
| _____ | )  11 C 592 |
| | ) |
| IBERDROLA RENEWABLES, INC., and | ) |
| GAMESA TECHNOLOGY CORPORATION, INC., | ) |
| | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| OUTLAND RENEWABLE ENERGY, LLC, | ) |
| OUTLAND RENEWABLE ENERGY FIELD | ) |
| SERVICES, LLC and OUTLAND ENERGY | ) |
| SERVICES, LLC, | ) |
| | ) |
| Third-Party Defendants. | ) |

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on the motion for a preliminary injunction by Counter-Plaintiffs Outland Renewable Energy, LLC, Outland Renewable Energy

Field Services, LLC, and Outland Energy Services, LLC (collectively, "Outland") against Gamesa Wind US, LLC ("Gamesa"). For the reasons set forth below, Outland's motion is denied.

## BACKGROUND

Gamesa sells the component parts of wind turbines to various wind farms. Gamesa's products were generally subject to a two-year warranty period, during which Gamesa would provide operation, maintenance, and repair services ("O&M Services") to its customers. Beginning in 2006, Gamesa subcontracted its O&M Services at various wind farms to Outland. Gamesa's subcontracts quickly became Outland's primary source of revenue.

The contractual relationship between Gamesa and Outland was defined by three different types of agreements. First, Gamesa and Outland entered into a Maintenance Service Agreement ("MSA"), effective for two years beginning on January 1, 2010. The MSA was a master agreement that served as a broad framework of terms and conditions governing the parties' ongoing relationship.[1] The MSA did not refer to the performance of services at any particular site or for any particular duration.

---

[1] Prior to executing the MSA, the parties had entered into a Framework Services Agreement (the "FSA"). The FSA served the same function as the MSA, outlining the broad terms of the parties' relationship. By its express terms, the MSA superseded all prior agreements "pertaining to the subject matter [t]hereof." Because the FSA and the MSA involved the same subject matter, i.e., the general terms and conditions governing the relationship between the parties, the MSA superseded the FSA and is the only enforceable master agreement between the parties.

Second, Outland and Gamesa executed Statements of Work ("SOWs") pursuant to the MSA for the services to be performed at each individual wind farm. The SOWs specified the price, scope, and duration of the O&M Services and explicitly incorporated the terms and conditions of the MSA.

Finally, Gamesa issued purchase orders for all services on its turbines, whether or not it had an SOW in place for those services. The purchase orders were expressly subject to the terms of the broader agreements between the parties, if such agreements existed. In the absence of such agreements, the purchase orders stated that Gamesa's general terms and conditions would apply. Each purchase order indicated the duration and price of the services requested.

On September 10, 2010 Gamesa began soliciting bids for O&M Services at the Big Horn Wind Farm ("Big Horn") in Bickleton, Washington. Although Outland submitted a bid, Gamesa selected another subcontractor, UpWind Solutions ("UpWind"), to perform O&M Services during the two-year warranty period. Gamesa and UpWind executed an SOW outlining the scope of UpWind's O&M Services at Big Horn, which spanned a two-year term. Approximately three months into this arrangement, however, Gamesa became dissatisfied with UpWind's performance and removed UpWind from Big Horn.

Gamesa subsequently negotiated with Outland to replace UpWind at Big Horn. The parties eventually agreed on a price, and Gamesa issued an Emergency Purchase

Order ("EPO") on February 7, 2011, whereby Outland would provide O&M Services at Big Horn for one month. On March 21, 2011 Gamesa amended the EPO (the "Amended EPO"), extending its term to a total of 11 months beginning retroactively on February 11, 2011 and expiring on January 10, 2012. Outland made several requests for Gamesa to issue an SOW with a two-year term, though Gamesa never did.

On May 12, 2011 Gamesa sent a letter to Outland declaring Outland in default under the safety provisions of the MSA after the United States Occupational Health and Safety Administration ("OSHA") issued six citations to Outland concerning Outland's safety procedures at a different wind farm. On July 21, 2011, Gamesa sent two additional letters to Outland declaring Outland in default under the confidentiality and non-compete provisions of the MSA. On January 18, 2012, Gamesa notified Outland that it was terminating Outland's services at Big Horn.

In response, Outland filed the present motion for a preliminary injunction to prevent Gamesa from removing Outland from Big Horn. On February 7, 2012 the Court granted a temporary restraining order prohibiting Gamesa from removing Outland from Big Horn, and on March 6, 2012 the Court conducted an evidentiary hearing to collect evidence on Outland's motion for a preliminary injunction.

## LEGAL STANDARD

"'A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of

-4-

persuasion.'" *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). To succeed on a motion for a preliminary injunction, a party must show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm that outweighs any harm the nonmoving party would suffer by granting the injunction; (3) the lack of an adequate remedy at law; and (4) the absence of harm to the public interest. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (citation omitted). A court will then weigh these factors against each other in a "sliding scale" analysis. *Id.*

## DISCUSSION

Outland seeks a preliminary injunction barring Gamesa from removing Outland from Big Horn. Outland maintains that allowing Gamesa to do so would result in a breach of their agreement. In essence, then, Outland's underlying claim is for a breach of contract. As the underlying claim represents a commercial dispute between two private parties, the only public interest involved is in the enforcement of valid contracts. *See Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 955 (N.D. Ill. 2007). We therefore focus our attention on the remaining factors.

**I.    Likelihood of Success on the Merits**

To succeed on a breach of contract claim, a plaintiff "must show: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess*

-5-

*v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (applying Illinois law) (citation omitted). The parties do not dispute the existence of a valid and enforceable agreement, though they vehemently dispute which agreement governs the parties' relationship at Big Horn. Gamesa maintains that the Amended EPO governs the relationship, while Outland maintains that the MSA controls.

Big Horn is not mentioned anywhere in the MSA or in any SOW issued pursuant to it. In fact, the only documented reference to Big Horn in an agreement is in the Amended EPO. The Amended EPO expressly incorporates the terms and conditions of the broader supply agreement between Gamesa and Outland. That broader agreement is the MSA. Therefore, the Amended EPO governs the scope, duration, and price of Outland's services at Big Horn, and Outland's performance of these services are subject to the broad terms and conditions outlined in the MSA.

Outland contends that because the MSA governed the parties' overall relationship, the two year term of the MSA must apply to Outland's O&M Services at Big Horn. However, the fact that the MSA has a term of two years does not require that any services performed under this umbrella agreement must also have a term of two years. The two-year term of the MSA only applies to the subject matter contained therein, and the agreement does not provide for the performance of O&M services at Big Horn. Rather, the Amended EPO provided the duration of the O&M Services to be performed at Big Horn. Moreover, the two-year term of the MSA expired on

December 31, 2011, nearly three weeks before the date that Gamesa attempted to remove Outland from Big Horn. Therefore, the Amended EPO governs the relationship of the parties, and its eleven-month term is enforceable. Thus, when the Amended EPO expired as of January 12, 2012, Gamesa was no longer obligated to retain Outland for O&M Services at Big Horn.

Outland points to several sources of extrinsic evidence to support its position that the parties intended a two-year term to apply to the contract at Big Horn. First, Outland submitted a work estimate prior to any agreement reached by the parties that stated that the "pricing assumes that Gamesa will enter into a two year contract with Outland." Second, Outland points to several e-mail exchanges between the parties indicating that they were contemplating issuing a SOW for Big Horn that would encompass a two-year term. Third, Outland cites to an e-mail from Matt Pimentel ("Pimentel"), Gamesa's Site Manager at Big Horn, stating that Pimentel would "require the technicians' names that will be [working on the wind farm] for the two year warranty as agreed."

This evidence is unpersuasive for several reasons. First, it is well-established that if a contract is unambiguous, it will be enforced as written without resort to extrinsic evidence. *See Lewitoon v. ITA Software, Inc.*, 585 F.3d 377, 380-81 (7th Cir. 2009). Here, the Amended EPO unambiguously states that Outland was to provide O&M Services at Big Horn for a term of eleven months. Second, even if the court considered the extrinsic evidence, such evidence does not demonstrate that the parties intended that

Outland provide O&M Services at Big Horn for two years. For example, in response to Outland's requests for an SOW with a two-year term, Gamesa replied that it would "follow up with [its] legal department and let [Outland] know the status." On another occasion, Gamesa indicated that it needed to meet with Outland to discuss how the parties would structure their contractual relationship at Big Horn, suggesting that the terms of the parties' relationship were uncertain. Additionally, Pimentel's e-mail was sent while the parties were still negotiating the terms of Outland's work at Big Horn, as the price had not even been agreed to at that point. Furthermore, the e-mail contains a disclaimer which states that the e-mail "does not in any case constitute a binding offer, acceptance or opinion for Gamesa unless so set forth in a separate document subscribed by a representative of the company with sufficient faculties to do so." Finally, both the EPO and the Amended EPO explicitly provide that "[Outland's] acceptance is strictly limited to the terms of the Purchase Order . . ." and that "[Gamesa] hereby objects to any different or additional terms contained in any proposal by [Outland] or response by [Outland] to this Purchase Order." Therefore, even considering the extrinsic evidence, the Amended EPO's eleven-month term governs the duration of the Big Horn project.

Because the Amended EPO governs Outland's O&M Services at Big Horn, it is unlikely that Outland can succeed on the merits. Gamesa sought to terminate Outland from Big Horn on January 18, 2012, nearly one week after the Amended EPO expired. Therefore, Outland is unlikely to establish that Gamesa breached the Amended EPO.

**II.     Irreparable Harm and Lack of Adequate Remedy at Law**

Outland argues that it would suffer irreparable harm if this Court denied its motion for a preliminary injunction and that this harm would significantly outweigh any potential harm to Gamesa. Outland maintains that Gamesa's removal of Outland technicians from Big Horn would destroy Outland's business, and that a suit to recover legal damages would be insufficient to prevent this collapse. Exposing a party to immediate bankruptcy or forcing a party out of business may constitute irreparable harm. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (citing *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984)). Outland maintains that its existing line of credit with Wells Fargo expired on February 29, 2012 and that Wells Fargo has declined to renew the line of credit in part because of the uncertainty in Outland's relationship with Gamesa. Moreover, Outland has a financing arrangement with Allco Finance Ltd. ("Allco"), and Allco holds a $260,000 promissory note from Outland that is payable on demand and secured by all of Outland's property. Outland contends that Gamesa's termination of Outland's O&M Services at Big Horn would cause Wells Fargo to decline to extend a new line of credit and would subject Outland to default under the Allco note and an accompanying foreclosure of its assets.

Outland's claim is belied by its financial statements. In 2011, Outland generated in excess of $19 million in revenue. Outland's projected revenue for 2012 is

$16 million, and its gross revenue from Big Horn for the remainder of the alleged two-year contract, if enforced, would comprise less than $450,000 of that revenue. It is difficult to accept that the loss of this amount, when viewed in light of Outland's projected earnings, would put Outland out of business. Rather, it appears that Outland's business was suffering for reasons unrelated to its contract at Big Horn. For example, Outland's Chief Financial Officer ("CFO") testified that Outland was already noncompliant with its various financial obligations. Even while Outland was working at Big Horn, it received two default notices from Wells Fargo. Outland ultimately refinanced the line of credit to reduce its monthly payments from approximately $25,000 to approximately $13,000. Outland had also previously defaulted on the Allco note but was forgiven. Although we recognize that Gamesa's termination of Outland's services at Big Horn may be the idiomatic straw that broke the camel's back, it is unlikely that this is the primary cause of the risk to Outland's business.

In light of Outland's existing financial struggles, it is also uncertain whether a preliminary injunction would spare Outland from the irreparable harm that it alleges. Outland's CFO testified that regardless of the Court's determination in this matter, Wells Fargo would not extend Outland a new line of credit. Rather, Outland's CFO speculated that a favorable ruling in this matter would merely increase the likelihood that Outland could obtain a different lender at less favorable terms. In sum, there is little to suggest that Outland will suffer irreparable harm as a result of the denial of a

preliminary injunction; rather, the evidence indicates that Outland may be forced out of business for other reasons unrelated to its contract at Big Horn.

Nevertheless, the potential harm to Outland is greater than the potential harm to Gamesa. Gamesa maintains that it could perform the services at Big Horn with a smaller crew of its own technicians, resulting in savings of approximately $188,000 over the nine months for which Outland seeks to extend the agreement. Although a preliminary injunction may cause financial harm to Gamesa, the potential harm to Outland from denying a preliminary injunction would result in greater economic loss to the company.

## III. "Sliding Scale" Analysis

Having assessed the likelihood of success on the merits, the lack of an adequate remedy at law, the harm to Outland weighed against the harm to Gamesa, and the harm to the public interest, we evaluate the magnitude of each of these factors against the others. Although the potential harm to Outland is greater than the potential harm to Gamesa, this difference is insufficient to overcome the weight of the unlikelihood of Outland's success on the merits. Additionally, the public interest in enforcing contractual obligations is only promoted to the extent that Outland is likely to succeed on its underlying breach of contract claim. Therefore, Outland's motion for a preliminary injunction is denied.

## CONCLUSION

For the foregoing reasons, Outland's motion for a preliminary injunction is denied.

                                             _____
                                             Charles P. Kocoras
                                             United States District Judge

Dated:   March 22, 2012