UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GAMESA TECHNOLOGY CORPORATION, INC., | ) | |
| GAMESA WIND US, LLC, IBERDROLA | ) | |
| RENEWABLES, INCORPORATED, STREATOR- | ) | |
| CAYUGA RIDGE WIND POWER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | 11 C 592 |
| | ) | |
| IBERDROLA RENEWABLES, INC., and | ) | |
| GAMESA TECHNOLOGY CORPORATION, INC., | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OUTLAND RENEWABLE ENERGY, LLC, | ) | |
| OUTLAND RENEWABLE ENERGY FIELD | ) | |
| SERVICES, LLC and OUTLAND ENERGY | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

CHARLES P. KOCORAS, District Judge.

This matter comes before the Court on Counter-Plaintiffs Outland Renewable

Energy, LLC's and Outland Energy Services, LLC's (together "Outland") motion for

leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15.

For the following reasons, the motion is denied.

# BACKGROUND[1]

This litigation began in December 2010 as a negligence claim as a result of an on-the-job injury. It has since spawned a host of crossclaims and counterclaims among the various parties involved in the suit. The present motion before the Court involves one discrete set of plaintiffs and one set of defendants. The Court limits its discussion to the events that relate to its analysis of the instant motion.

On September 22, 2011, Outland filed a twenty-two count counterclaim against Counter-Defendants Gamesa Wind U.S., LLC and Gamesa Technology Corp. Inc. (together "Gamesa"). Gamesa moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), which the Court granted with respect to all but one count for indemnification. *See McCoy v. Gamesa Tech. Corp.*, No. 11 C 592, 2012 U.S. Dist. LEXIS 138417 (N.D. Ill. Sept. 26, 2012). Outland now seeks leave to amend the complaint and has attached a seven-count proposed first amended complaint ("amended complaint"). The Court recounts the claims and allegations found therein.

## I.     Amended Complaint

---

[1] In assessing the complaint's legal sufficiency, the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012).

### A.    Gamesa-Outland Contracts

Outland was a Minnesota company that provided wind farm operation, maintenance, and repair services ("O&M Services") to the wind energy industry in the United States and abroad.  Gamesa manufactures wind turbines ("turbines").  As part of Gamesa's standard sales agreements, Gamesa would require purchasers to contract with it for O&M Services for a specified amount of time.  Gamesa did not maintain its own internal O&M Services group, but instead subcontracted O&M Services work to independent companies, including Outland.  Gamesa subcontracted O&M Services work to Outland from 2006 to 2012.  Outland represents that it furnished superior services to Gamesa.

Beginning in 2006, Outland performed work on Gamesa's behalf under a series of "Purchase Orders," which set forth a task or a set of specific tasks to perform at a particular site.  Outland's revenue as a result of performing under various Purchase Orders grew from $225,000 in 2006 to $6.1 million in 2010.

On October 3, 2008, Outland and Gamesa entered into the Framework Services Agreement ("FSA"), the first contract that called for Outland to perform O&M Services over a more prolonged period of time at wind farms owned by Iberdrola Renewables Inc. ("Iberdrola"), one of Gamesa's clients.  On November 19, 2008, Outland and Gamesa entered into a new agreement entitled the Maintenance Services Agreement ("MSA"), which placed additional Iberdrola-operated wind farms under a long-term agreement.  Iberdrola's wind farm at Cayuga Ridge was one of the sites

governed by the MSA.

Outland alleges that the MSA revised many of the provisions in the FSA. Specifically, it revised the contours of the FSA's noncompetition clause, the governing law clause, the dispute resolution clause, and the clause dealing with the solicitation of the other party's employees. Further, the MSA set forth that Outland was required to satisfy all of Gamesa's customers' needs with respect to O&M Services, including maintenance, design modifications, and technical support. Outland was also responsible for training its personnel on safety and technical standards. Finally, the MSA obligated Outland to follow site-specific rules and protocol established by Iberdrola.

### B.     Events Leading to the Cayuga Ridge Accident

Outland technicians required its wind turbine technicians to employ a safety procedure known as the "lock-out tag-out" ("LOTO") procedure. The LOTO procedure complied with industry standards and federal regulations. On September 23, 2010, Gamesa and Iberdrola instructed Outland's on-site personnel to follow a modified procedure ("modified LOTO procedure"), which was put in place to increase maintenance efficiency. No member of Outland's off-site management was aware of the modified LOTO procedure's implementation. On October 20, 2010, while working under the modified LOTO procedure, Aaron McCoy ("McCoy") and several other Outland technicians were performing repair and maintenance work on wind turbines at Cayuga Ridge. At one point, an Outland technician radioed an Iberdrola

technician to power up a particular wind turbine. The Iberdrola technician mistakenly powered up the wind turbine that McCoy was then scaling. An electrical explosion occurred, and McCoy sustained injuries as a result.

The United States Occupational Health and Safety Administration ("OSHA") conducted an investigation of Cayuga Ridge in response to the accident. Outland's personnel cooperated fully with OSHA. On April 8, 2011, OSHA issued six citations against Outland. Upon learning that only Outland was cited, Gamesa manager Gary Stansbury ("Stansbury") stated to Outland executive Steve Scott ("Scott"), "to be honest, we're shocked we weren't cited as well."

### C.    Gamesa's Plans to Eliminate Outland

In August 2010, Gamesa hired Rick Hammill ("Hammill") and Stansbury to lead Gamesa's services department. Outland alleges that Hammill decided that Gamesa would establish its own internal O&M Service group, which would reduce the amount of work subcontracted to providers like Outland. Gamesa reached this decision despite promises to Outland that it would continue to tender work to Outland. Based on Gamesa's representations, Outland continued to invest in equipment with the expectation that the work would continue.

Outland alleges that around the end of 2010 and the beginning of 2011, Gamesa devised a plan to offer to buy out Outland. If Outland refused, Gamesa planned to destabilize Outland and put it out of business. Specifically, Gamesa would represent to Outland that it would receive more business from Gamesa, causing Outland to

make substantial investments in equipment and personnel. After Outland made these investments, Gamesa would cease providing business to Outland, which would put Outland out of business and enable Gamesa to staff its nascent internal O&M Services group with experienced Outland technicians.

In January 2011, Stansbury expressed to Scott Gamesa's interest in acquiring Outland. Scott declined, insisting that Outland wished to remain independent. In January or February, Gamesa secretly decided to cease tendering Purchase Orders to Outland.

On February 17, 2011, Outland and Duke Energy ("Duke") entered into an agreement (the "Acquisition Agreement") under which Duke would purchase a 25% share in Outland. As part of the Acquisition Agreement, Outland would receive all of the O&M Services contracts for Duke's wind farms ("Duke O&M Agreement"). Outland informed Stansbury about the Acquisition Agreement a week later, and that Duke or another party may eventually acquire all of Outland. Gamesa knew that Duke and Outland would enter into the Duke O&M Agreement, and determined that Gamesa would be unable to destabilize the company if the agreements were consummated.

On February 26, 2011, Stansbury called Scott and, after assuring Scott that Gamesa was happy with Outland's work, told him that he believed that Iberdrola would not permit Outland to continue to work on its wind farms, since Iberdrola and Duke were competitors. On March 27, 2011, Scott contacted Iberdrola's Vice

President of Commercial Operations, who gave the Acquisition Agreement Iberdrola's blessing, and stated that the competition issue was not a concern.

Gamesa then contacted Duke directly on April 14, 2011 and attempted to entice Duke to refrain from entering into the Acquisition Agreement by offering a five-year warranty extension of O&M Services on one of Duke's turbine projects in Pennsylvania. Duke rejected the offer and informed Gamesa that Duke would no longer tender O&M Services work to Gamesa.

On May 11, 2011, the Acquisition Agreement was amended (the "Amended Acquisition Agreement") to add Sterling Partners ("Sterling"), an institutional investor, as a buyer. Outland alleges that Gamesa knew or had reason to know that Outland, Duke and Sterling entered into the Amended Acquisition Agreement.

On May 12, 2011, Gamesa sent Outland a letter (the "May 12th letter") stating that "Outland has failed to perform O&M Services in accordance with the health, safety and environmental requirements of the [MSA] and applicable law. This failure has been noted by OSHA . . . ." According to Outland, the letter raised frivolous issues and was sent in bad faith. Gamesa then ceased tendering any more Purchase Orders to Outland. According to Outland, the letter and Gamesa's refusal to tender any further transactional work to Outland immediately disrupted the Duke-Sterling-Outland deal by causing Duke and Sterling to reduce their offer to purchase Outland by $15 million and scuttling the Duke O&M Agreement altogether. The cessation of

Purchase Order business caused 40% of Outland's technicians to sit idle.

Upon receipt of the May 12th letter, Outland responded with its own letter to Gamesa rejecting Gamesa's termination of the MSA. Gamesa followed up with another letter on May 27, 2011, in which it stated that "Outland was cited by OSHA for failing to comply with various provisions of 29 C.F.R. § 1926 et seq." Outland again responded by rejecting Gamesa's purported termination of the MSA.

On July 21, 2011, Gamesa sent another letter to Outland asserting a different basis for claiming that Outland had defaulted under the MSA. It also asserted a breach of the FSA. Outland again notified Gamesa that it rejected its efforts to terminate the MSA.

Ultimately, the Duke-Sterling-Outland acquisition was never consummated. However, on November 1, 2012, Outland transferred substantially all of its business assets and employees to Duke in order to avoid receivership.

### D.  Tying of Gamesa's Turbine Sales and O&M Services

Outland alleges that at all times relevant to this lawsuit two markets existed in the United States: one for turbines, the other for O&M Services of Gamesa turbines. From 2007 through August 2008, there was a shortage of available turbines in the United States for sale such that demand for turbines far exceeded supply. Further, any increase in turbine manufacturing would be years away.

At its peak, Gamesa controlled over 10% of the overall turbine market, and

100% of the market for Gamesa O&M Services. In 2007 through 2008, because of the scarcity of available turbines combined with high demand, Gamesa was able to leverage its power by forcing purchasers to enter into agreements that they would not ordinarily do under normal market conditions. Gamesa allegedly used this power to force its customers to purchase O&M Services upon purchasing its turbines.

## II.    Procedural Posture

McCoy filed a complaint sounding in negligence against Gamesa Technology, LLC and Iberdrola in Illinois State Court in late 2010. The case was removed to this Court based on diversity jurisdiction. A series of cross and counterclaims ensued between Iberdrola, Gamesa and Outland. Relevant to this motion, Outland filed a twenty-two count complaint against Gamesa, alleging that Gamesa had unlawfully interfered with Outland's business relationship with Duke. Gamesa also filed counterclaims against Outland, and Outland sought a preliminary injunction seeking a finding that Gamesa was bound by the MSA to employ Outland at the Big Horn Wind Farm ("Big Horn") in Bickleton, Washington past the expiration of the one-year purchase order issued by Gamesa in connection with the work at Big Horn. The Court held a five day evidentiary hearing and ultimately denied the motion for a preliminary injunction. *See McCoy v. Gamesa Tech. Corp.*, No. 11 C 592, 2012 U.S. Dist. LEXIS 38745 (N.D. Ill. Mar. 22, 2012). This Court then dismissed this counterclaim based on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), except with respect to one count for indemnification. *See McCoy v. Gamesa Tech. Corp.*, No. 11

-9-

C 592, 2012 U.S. Dist. LEXIS 138417 (N.D. Ill. Sept. 26, 2012). Gamesa and Outland reached a settlement with respect to the indemnification claim, and this Court entered an Order of Good Faith Settlement on February 5, 2013. Outland then filed the instant motion to amend on March 4, 2013, in which it attached a proposed seven count amended complaint against Gamesa.

## LEGAL STANDARD

After dismissal of a complaint, a party must obtain the opposing party's consent or obtain leave from the court to amend its pleading. Fed. R. Civ. P. 15(a)(2). "[District] courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Johnson v. Cypress Hill*, 641 F.3d 867, 871-72 (7th Cir. 2011) (internal citation omitted). While delay alone generally will not justify denying leave to amend a pleading, there is a presumption against granting leave where the delay is so extreme that it prejudices the opposing party. *King v. Cooke*, 26 F.3d 720, 723 (7th Cir. 1994).

A proposed amended complaint is futile if it fails to state a claim upon which relief may be granted. *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997). A court analyzes whether an amended complaint is futile under the same standard as a motion to dismiss under Rule 12(b)(6). *Id.* at 1085.

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint.

*Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). The allegations in a complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not provide detailed factual allegations; he must only provide enough factual support to raise his right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Furthermore, a claim must be facially plausible, a requirement that is satisfied if the pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## DISCUSSION

Gamesa raises two grounds for denying Outland leave to amend the complaint. First, Gamesa contends that it is unduly prejudiced by Outland's not having sought leave earlier. In the alternative, Gamesa argues that the claims asserted in the amended complaint are futile because they are not cognizable at law.

### I. The Timing of Outland's Motion for Leave to File its Amended Complaint

Gamesa contends that Outland's motion for leave to amend should be denied because a contrary ruling would delay the resolution of McCoy's claims against Outland and Gamesa, thereby prejudicing Gamesa. However, Gamesa fails to specify how granting the instant motion would in fact delay the resolution of McCoy's remaining claims. Moreover, the Court's February 5, 2013 Order on Gamesa's Motion for Finding of Good Faith Settlement relating to McCoy's claims expressly

disclaimed any effect that the settlement would have on the viability of Outland's counterclaims and Gamesa's crossclaims. Rather than "allowing Outland to essentially start a new lawsuit now," as Gamesa contends, the Order indicates that Gamesa should have expected Outland to attempt to file for leave to amend after its first complaint was dismissed. Because Gamesa provides insufficient support of undue delay and resulting prejudice, the Court rejects its argument.

## II. Futility

### A. Choice of Law

Before discussing the merits of Outland's claims, the Court first addresses the threshold issue of which state's laws govern those claims. Outland's original twenty-two count complaint asserted several Illinois statutory and common law claims. It now asserts that Minnesota law should govern its non-federal claims.

Courts in Illinois that sit in diversity apply the "most significant contacts test" to determine which state's law governs the dispute. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). However, a party waives its choice of law argument where it fails to timely assert it. *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009) (Courts sitting in diversity apply the forum state's law where the parties fail to raise the choice of law issue); *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995) ("[C]hoice of law, not being jurisdictional, is normally . . . waivable.").

Outland asserts for the first time that its claims arise under Minnesota state law

despite not having raised a choice of law issue at any time prior to the instant motion's briefing. In light of Outland's failure to raise the issue before now, the Court will assess Outland's claims under Illinois law. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, No.* 92 C 7768, 1999 U.S. Dist. LEXIS 917, at *4 (N.D. Ill. Jan. 15, 1999) (denying the defendant's motion to dismiss based on choice of law argument where it failed to raise the issue on a prior motion for reconsideration with respect to the same claim).

### B.    Count I: Tortious Interference with Contractual Relations

Outland alleges that Gamesa's actions with respect to Duke constitute tortious interference with contractual relations. Outland alleges that: (i) Gamesa caused Duke and Sterling to fail to close the acquisition of all the member interests of Outland at the price set forth in the Amended Acquisition Agreement; (ii) alternatively, that Gamesa caused Duke and Sterling to fail to proceed to close the acquisition of a portion of the member interests of Outland at the price set forth in the Acquisition Agreement; and (iii) Gamesa caused Duke to breach its commitment to enter into the Duke Fleet Services Agreement ("DFSA") with Outland for Duke's fleet of wind farms.

To state a claim for tortious interference with a contract, a plaintiff must allege: (i) the existence of a valid and enforceable contract between it and a third party; (ii) the defendant's knowledge of that contract; (iii) the defendant's intentional and unjustified inducement of the third party to breach the contract; (iv) the third party's

breach; and (v) damages. *Strosberg v. Brauvin Realty Svcs., Inc.*, 691 N.E.2d 834, 845 (Ill. App. Ct. 1998).

Outland's first claim is deficient because it has not pleaded facts that demonstrate Gamesa's knowledge of the Amended Acquisition Agreement. Outland asks this Court to impute knowledge upon Gamesa due to Gamesa's knowledge of the Acquisition Agreement; however, Outland's knowledge of one agreement is insufficient to demonstrate knowledge of a separate agreement. Though Gamesa contacted Duke on April 14 and attempted to induce Duke into scuttling its acquisition of a stake in Outland, Duke not only refused but then entered into the Amended Acquisition Agreement with Outland.

With respect to Outland's claim regarding the Acquisition Agreement, Outland cannot plausibly show a breach of that agreement. The Amended Acquisition Agreement altered the Acquisition Agreement; therefore, if Duke were guilty of a breach, it logically would have to be a breach of the Amended Acquisition Agreement. As the Acquisition Agreement could not have been breached due to the amendment, Outland's claim based upon it also must fail.

Outland's third claim under this count is deficient because it asserts a breach by Duke of a "commitment" to enter into the DFSA. The Court notes that Outland does not use the term "contract." This Court is unaware of a cause of action for breach of a commitment, and Illinois law requires there to have been a contract in order for a

-14-

tortious interference with contract claim to survive. *See Strosberg*, 691 N.E.2d at 845.

### C. Count II: Tortious Interference with Prospective Economic Advantage

Outland argues that Gamesa's actions with respect to Duke constitute tortious interference with prospective economic advantage. Outland alleges that: (i) Gamesa caused Duke and Sterling to fail to proceed to close the acquisition of all the member interests in Outland at the price set forth in the Amended Acquisition Agreement; (ii) alternatively, Gamesa caused Duke to fail to proceed to close the acquisition of a portion of the member interests of Outland at the price stated in the Acquisition Agreement; and (iii) Gamesa caused Duke to breach its commitment to Outland to enter into the DFSA for Duke's fleet of wind farms.

To state a claim for tortious interference with prospective economic advantage, a party must allege: (i) the plaintiff's reasonable expectancy of entering into a valid business relationship; (ii) the defendant's knowledge of that expectancy; (iii) the defendant's intentional and unjustified interference that caused a breach or termination of that expectancy; and (iv) damages. *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1133 (Ill. 2001). "[C]ommercial competitors are privileged to interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will."

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1019 (Ill.

2008).

Outland's claim pursuant to the Amended Acquisition Agreement is deficient because this Court does not deem the knowledge prong of the *Voyles* test to have been satisfied. Gamesa's knowledge of a prior agreement does not signify its knowledge of the Amended Acquisition Agreement. The Court will only hold Gamesa responsible for any interference regarding the Acquisition Agreement and not the Amended Acquisition Agreement. Duke could not have breached the Acquisition Agreement because it was replaced by the Amended Acquisition Agreement. Furthermore, Outland has pleaded no facts that demonstrate that its economic relationship with Duke has been terminated. Rather, Outland claims that the acquisition price that Duke paid to Outland was less than the price set forth in both agreements. This Court has thoroughly reviewed Illinois law and can discern no instance in which a claim based upon interference with prospective economic advantage has survived where there has been no termination of the economic relations.

Outland avers that the issue of Gamesa's being a competitor is a question of fact and hence improper to evaluate at this stage of the proceedings. Outland, however, alleges that Gamesa was partially motivated to interfere with Outland's prospective economic advantage because Gamesa had the "goal of creating its own large O&M service group, while at the same time eliminating Outland as a competitor of [that] group." The Court reads this portion of Outland's proposed amended complaint as a concession that Gamesa was not wholly motivated by ill will towards

Outland but rather sought to advance its interests as a competitor. Hence, Outland's claim for interference with prospective economic advantage would also fail on this basis. *See Imperial Apparel*, 882 N.E.2d at 1019.

### D.   Count III: Prima Facie Tort

Outland posits that Gamesa has perpetrated a prima facie tort. "One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances[,] [and] [t]his liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." Restatement (Second) of Torts § 870 (1965). Outland cites to the recognition of this tort by the United States Supreme Court. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008). Outland also cites to Pennsylvania case law recognizing this tort; however, as this Court has determined that Illinois law is applicable, Outland's citations are inapposite.

Illinois courts have never recognized prima facie tort as a cause of action. *See generally Barry Gilberg, Ltd. v. Craftex Corp.*, 665 F. Supp. 585, 596-97 (N.D. Ill. 1987) (explaining the rationale for lack of recognition of this tort). Outland claims that the Seventh Circuit has "questioned" *Barry Gilberg*. *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1042 (7th Cir. 1999). This Court discerns no disagreement from the *Kirksey* court with *Barry Gilberg*. Furthermore, Outland points to no Illinois case law recognizing such a tort since *Barry Gilberg* and *Kirksey* were decided. Hence, amending the complaint to add this cause of action would be

futile, as no such cause of action exists in Illinois, and this Court denies the amendment with respect to this count. *See GE Capital*, 128 F.3d at 1085 (amendment is futile where it fails to state a claim upon which relief may be granted).

### E. Counts IV & V: Promissory Estoppel and Breach of Fiduciary Duty

Outland seeks to recover based on promissory estoppel and breach of fiduciary duty. Outland, however, failed to plead either theory in its original complaint. A court should not allow an amended complaint that changes the theory of the case unless the amending party demonstrates a "lack of knowledge, mistake or inadvertence or some change of conditions over which that party had no knowledge or control." *Johnson v. Sales Consultants, Inc.*, 61 F.R.D. 369, 371 (N.D. Ill. 1973). Though neither party presented this argument in the briefing of the instant case, this Court, pursuant to its broad discretion in terms of permitting amendments, sua sponte declines to permit Outland to amend its complaint to add these counts. Ruling to the contrary would permit Outland to benefit from the dismissal of its insufficient first complaint by adding multiple new causes of action of which it either knew or should have known when it filed its first complaint. Additionally, allowing Outland to proceed with these counts would unfairly burden Gamesa. Outland's original complaint was dismissed over eight months ago. Prior to that, the Court conducted a five day evidentiary hearing with respect to Outland's request for a preliminary injunction. Forcing Gamesa to expend time preparing defenses to claims that could

have been but were not raised would be unduly burdensome to Gamesa, for in addition to the resources required for briefing and argument, additional discovery may need to be procured. The Court declines to facilitate further delay in this already protracted litigation and thus denies the request to amend with respect to these counts.

### F.    Count VI: Indemnification

Outland sought indemnification from Gamesa in its original complaint, and this Court did not dismiss that count. *See McCoy*, 2012 U.S. Dist. LEXIS 138417, at *13. The parties did not dispute the propriety of that count, but Outland now seeks to expand upon it. Outland seeks indemnification pursuant to Section 7.4 of the MSA (the "Indemnification Provision") as well as common law indemnification for: (i) its payments to OSHA stemming from McCoy's accident; (ii) losses that occurred as a result of Duke's not having proceeded with the Acquisition Agreement or the Amended Acquisition Agreement and Duke's not having engaged Outland as a service provider for its fleet of wind farms; and (iii) costs that Outland incurred for additional equipment and employees to ramp-up the promised additional work.

This Court's Order of Good Faith Settlement bars Outland's indemnification claim with respect to OSHA costs relating to McCoy's accident. Those costs were precisely what the settlement was designed to address, and Outland cannot now obtain additional compensation pursuant to the Indemnification Provision. The text of the Indemnification Provision bars Outland's second and third indemnification claims, for the Indemnification Provision applies to payments that Outland would have to tender

to a third party for bodily injury or property damage, not to losses sustained by Outland. With respect to Outland's claim for common law indemnification, Outland could have but did not plead this claim in its original complaint, and the Court declines to permit Outland to add a claim of which it should have been aware at the time of the filing of its original complaint. *See Johnson*, 61 F.R.D. at 371.

### G. Count VII: Unlawful Tying

Outland alleges that Gamesa unlawfully tied O&M Services of Gamesa turbines to the sale of turbines in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. This, Outland claims, precluded it from competing against Gamesa for the provision of O&M Services. Gamesa argues that the claim fails because Outland failed to allege that Gamesa retained sufficient market power to be found liable for an unlawful tying scheme.[2]

The standards for adjudicating a tying violation under Section 1 of the Sherman Act and Section 3 of the Clayton Act are the same. *Sheridan v. Marathon Petroleum Co., LLC*, 530 F.3d 590, 592 (7th Cir. 2008). The gravamen of a tying claim lies in the seller's ability to leverage its market power in the market for the "tying product" to "force" buyers into purchasing the "tied product." As the Supreme Court explained in the seminal case *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984),

---

[2] Gamesa contends that a viable tying claim must allege that a product – not a service – was tied to another product. However, the Seventh Circuit has expressly recognized that claims involving the tying of services to products are viable under the Sherman and Clayton Acts. *Sheridan v. Marathon Petroleum Co., LLC*, 530 F.3d 590, 592 (7th Cir. 2008). Gamesa's argument is accordingly denied.

the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained . . . .

*Id.* at 12; *see also Sheridan*, 530 F.3d at 592 ("The traditional antitrust concern with [a tying] agreement is that if the seller of the tying product is a monopolist, the tie-in will force anyone who wants the monopolized product to buy the tied product from him as well . . . ."). To establish per se tying, a plaintiff must plead that: "(1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected." *Reifert v. South Central Wisconsin MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006). A tying claim under the rule of reason also requires a showing that the seller had sufficient market power in the tying product. *See Hardy v. City Optical*, 39 F.3d 765, 767 (7th Cir. 1994) (recognizing that in the Seventh Circuit, "market power is a threshold requirement of all rule of reason . . . cases.").

Outland alleges that Gamesa possessed requisite market power to coerce customers into purchasing unwanted O&M Services. Market power is "the power to raise price above the competitive level without losing so much business to other sellers that the price would quickly fall back to the competitive level." *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1007 (7th Cir. 2012). Market power, and its

relation to market share, is crucial to establishing a tying claim. As the Seventh Circuit explained in *Sheridan*,

> a seller who has a large market share may be able to charge a price persistently above the competitive level despite the existence of competitors. Although the price increase will reduce the seller's output . . ., his competitors, if they are small, may not be able to take up enough of the slack by expanding their own output to bring price back down to the competitive level; their costs of doing so would be too high -- that is doubtless *why* they are small.

530 F.3d at 594 (citations omitted); *see also Jefferson Parish*, 466 U.S. at 17 (stating that the likelihood that a seller possesses market power if "the seller's share of the market is high, or when the seller offers a unique product that competitors are not able to offer.").

Outland alleges that Gamesa achieved sufficient market power in the tying product, turbines, because of a shortage in supply in the turbine market. This, Outland alleges, gave Gamesa the opportunity to "force" its customers to purchase O&M Services along with turbines.

The amended complaint alleges that Gamesa possessed a 10% market share in the U.S. turbine market. Under the reasoning in *Sheridan*, any attempt by Gamesa to leverage what little power it possessed in the turbine market would be met by customers flocking to its competitors. Outland instead advances a novel theory of market power to justify its claim. It alleges that "a shortage of wind turbines resulted in sufficient market power for Gamesa" to tie O&M Services to the sale of turbines. But if Gamesa were the only turbine manufacturer with inventory, it stands to reason

that its market share would dramatically increase. Outland thus fails to allege plausible facts that Gamesa was capable of forcing customers into purchasing unwanted O&M Services.

In light of the allegations within the amended complaint, it is implausible to infer that Gamesa unlawfully tied O&M Services to the sale of its turbines. Gamesa was not in a position to "exploit[] its control over the tying product to force the buyer into the purchase of a tied product," because the allegations fail to establish that it possessed the requisite level of control over the turbine market. *See Jefferson Parish*, 466 U.S. at 12. Outland's tying claim is without merit.

## CONCLUSION

For the foregoing reasons, Outland's motion for leave to file an amended complaint is denied.

_____
Charles P. Kocoras
United States District Judge

Dated:  June 12, 2013

-23-